Commonwealth *v.* Peyton, Appellant.

Argued September 27, 1948. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

, *Charles J. Margiotti,* with him *Vincent M. Casey* and *Margiotti & Casey,* for appellant.

*William H. Colvin,* Assistant District Attorney, with him *William S. Rahauser,* District Attorney, *Craig Stockdale,* Assistant District Attorney, and *Leo Kelly, Jr.,* Assistant District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, November 8, 1948:

This is an appeal by defendant, Charles Peyton, from the judgment and sentence of the Court of Oyer and Terminer of the County of Allegheny, entered upon a verdict of murder in the second degree. The sentence was imprisonment in the penitentiary for not less than 10 years or more than 20 years. The Commonwealth alleges that on June 26th, 1947 at 2:20 A.M. Charles Peyton intentionally shot his wife, Mary, with malice aforethought, the victim dying ten hours later. Defendant was charged in two bills of indictment, one with murder and the other with voluntary manslaughter.

Peyton conducted a roadhouse on Routes 22-30 Robinson Township, Allegheny County. It consisted of a large clubroom, bar and kitchen on the first floor, the living quarters of defendant and his wife in the basement, and Chef John McKenna's quarters on the second floor.

McKenna testified that the defendant procured a .45 caliber pistol from his downstairs living quarters and placed it on the table in the kitchen, telling McKenna that "the reason he had the gun was to defend his property, that he hoped he would never kill anyone but that he would fire a shot to scare anyone away." McKenna then went upstairs by way of the glass door leading from the kitchen to the stairway. After he had retired he heard a banging on a door, (which he supposed was the outside door), and a female voice exclaim, "Let me (or us) in Charlie." Shortly afterwards he heard a pistol shot, dressed hurriedly, and came down the stairway to the glass door leading into the kitchen. He further testified that there was an empty bucket against the opposite side of the door which was not there when he went upstairs. The Commonwealth claims that this bucket was so placed that if the chef pushed the door open it would make a noise and Peyton would thereby be apprised of his coming. He stated that a screw driver was in the hasp of the door to his right which led into the storage room. However, he did not try this door. From this position he observed that the north door leading from the kitchen into the barroom was open and that the ceiling light was on in the kitchen. He called the defendant, and receiving no response, called again. After the second call, Peyton appeared in the north entry to the bar and then disappeared again. McKenna crossed the kitchen to the north door and followed defendant who was running up along the bar. Defendant turned and said he had shot Mary (his wife) accidentally. When defendant made this statement he was probably six feet away from his wife, who said nothing.

Back of the bar, near the south entry, the witness discovered the body of Mary Peyton on the floor. The bar-room was dimly lighted. He could see the hole in the apron through which the bullet had passed and powder marks around the hole.

The bullet had entered the victim's body through the left breast and emerged through the right hip. When the defendant approached his wounded wife she told him to "get away" from her. He approached her a second time and again she told him "to get away" from her. At the time Peyton was on his knees beside his wife and was saying to her that he was sorry, that it was an accident, that he didn't know she was there and he was trying to caress her. Peyton went, at the direction of McKenna, to the phone to call a doctor and after finishing the call, turned around and said he was going to call the police. Shortly afterwards the telephone rang and the witness answered the phone. A girl asked if this were Peytons, said this was the doctor, and that the doctor would be right out.

County Detective Brotherton testified that he arrived at the Peyton roadhouse at 4:04 A.M. and Peyton said he had accidentally shot his wife. Peyton told him that he had thrown the gun on the floor under the bar and the witness located it. This is defendant's account of the shooting: after everyone had left he started to clean up the bar. An automobile drove up and he heard several voices, male and female. They knocked at the door and said they wanted a drink. He told them to go away but they persisted. They said if he didn't let them in they were going to come in so he went and got the gun. He turned out all the lights thinking they would leave, but they kept pounding at the door. He then discharged the gun and immediately someone screamed "Charlie" and he realized that he had accidentally shot his wife. He did not know how she had gotten there as the last he knew she was downstairs in bed. She was walking in her bare feet. He stated that

he had called a doctor but one would not come at that hour of the night.

Samuel J. Riddle, Sergeant of the County Detectives of Allegheny County, testified that he arrived at the roadhouse at about 4:40 A.M. on June 26, 1947. Defendant told him that he had closed the place at two and was sitting on a stool in back of the bar when he heard a pounding on the front door and a girl's voice. His wife went to the ladies room (in the storeroom) and the pounding continued. In order to scare them away he fired a shot into the floor and then his wife fell on the floor in front of him and that was the first he saw her or knew she was there. The witness asked defendant to show him the door through which his wife came to go to the ladies room and defendant led him to the door into the storeroom, which door, witness testified, was then fastened on the kitchen side by a screwdriver through the hasp.

Defendant told the same story at Headquarters with these additional facts: that his wife *must have* come from the ladies room, that he didn't *know* she was there; that McKenna came down about three minutes after the shot was fired; that he, defendant, called Tom Peyton and told him to get a doctor; that he didn't know how far away his wife was standing when he shot her because he didn't see her.

Tests for visibility in the barroom showed that with lights burning in the kitchen and with all the doors leading into the barroom closed, it was impossible to see in the barroom; when the north door was open six inches conditions were such that you could see people moving around; and when it was wide open you could see very well.

Dr. John H. Kiel, Jr., testified to the declarations made by Mrs. Peyton shortly after her admission to the hospital. In the presence of two witnesses, whom he believed to be her mother and sister, he asked Mary Peyton who had shot her and she answered that her

husband had shot her and then added that it was accidental. One of the women said to her: "Well, how about the other times?" Mrs. Peyton did not reply.

After the dying victim had had the last rites of the Catholic Church administered to her by a priest, County Detective Sam Riddle questioned her as to the shooting. According to his testimony she said: "Charlie and I were in the kitchen when a knock came to the front door. He grabbed the gun and we started out and we got down by the kitchen door. Charlie stopped. I turned around to go back to him and he shot me." The detective then asked her if her husband could see her at that time. She answered: "Yes, and I saw him." The detective next asked her if the shooting was accidental or on purpose and she replied: "On purpose."

The Commonwealth also introduced witnesses who testified that defendant had abused his wife over a period of years and that he had shot at his wife on other occasions.

The jury returned a verdict of murder in the second degree with a recommendation of mercy. Defendant's motion for a new trial was dismissed and sentence was duly imposed. This appeal followed.

The first and second assignments of error raised the question whether on an indictment charging respectively murder and manslaughter there can be a verdict of murder in the second degree where the evidence of the Commonwalth tends to prove an intentional, malicious homicide and the evidence on behalf of the defendant tends to prove an accidental killing. The defendant contends that such a verdict is inconsistent with the evidence and should therefore be set aside.

It has so long been settled in Pennsylvania that, in the language of section 701 of The Penal Code of 1939, P. L. 872, and previous criminal codes, "The jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, ascertain in their verdict whether the person is guilty

of murder of the first or second degree", that it is somewhat a matter of surprise that anyone "learned in the law" should now raise the question presented in the assignments of error now under discussion.

This Court said in *Commonwealth v. Flax*, 331 Pa. 145, 200 A. 632: " 'In a murder case the jury are not bound to accept the version of the Commonwealth or that of the defense; it is their duty to consider all the testimony and to make up their minds therefrom as to the facts.' " See also *Commonwealth v. Kellyon*, 278 Pa. 59, 122 A. 166 and Wharton on Homicide, 3d edition, 1044, section 653. The first and second assignments of error are overruled.

The fifth assignment of error is based on the admission of the testimony of Detective Samuel J. Riddle relative to the alleged dying declarations of the decedent. The appellant's contention that these declarations do not possess the character of admissible dying declarations is well answered by the opinion of the court below written by Judge McNAUGHER, in refusing the motion for a new trial, where the learned judge said: "The nature of the wounds made by the .45 caliber bullet in its course through the body of the deceased, at one point tearing a hole in the stomach as large as a silver dollar, and at another macerating a lobe of the liver to a pulp; the testimony of the physicians as to the seriousness of the patient; the fact that before the declarations were made the last rites of the Church had been administered by a Catholic priest; and the fact that she died within a few hours afterward; all of these considerations taken together constituted a sufficient basis for a conclusion by the jury that the deceased was in a dying condition and realized it." In *Commonwealth v. Puntario*, 271 Pa. 501, 505, 115 A. 831, this Court held that the nature of the victim's wounds was such in itself as to justify the conclusion that the deceased was aware of his impending death. In that case the opinion writer, Justice SADLER, quoted the following from 1 R. C. L.

546: " 'It is well settled that the sense of impending death which the dying person must have had in order to render a dying declaration made by him admissible in evidence may be inferred from the nature of the wound or the state of his illness without any express declaration to show that he was sensible of impending death.' " The opinion also quoted Wigmore on Evidence, vol. 2, p. 1807 as follows: "In ascertaining this consciousness of approaching death, recourse should naturally be had to all the attending circumstances. It has been contended that only the statements of the declarant could be considered for this purpose; or, less broadly, that the nature of the injury alone could not be sufficient, i. e., in effect, that the declarant must show in some way by conduct or language that he knew he was going to die. This, however, is without good reason. We may avail ourselves of any means of inferring the existence of any such knowledge; and if, in a given case, the nature of the wound is such that declarant must have realized his situation, our object is sufficiently attained. Such is the settled judicial attitude." To the same effect is the opinion of the United States Supreme Court in *Mattox v. United States*, 146 U. S. 140.

There is no doubt that Mrs. Peyton, with a ghastly and gaping wound in her left breast, caused by a bullet from a .45 caliber revolver, a bullet which tore a hole in her stomach as large as a silver dollar, was completely aware of the fact that her death was imminent when she made the statement as to her husband's having shot her "on purpose".

Appellant also contends the dying declarations constituted the mere opinions of the declarant and as such they were not admissible. What Wigmore on Evidence, Third Edition, Vol. 5, Sec. 1447 said, negatives this contention, to wit: "The Opinion rule has no application to dying declarations. The theory of that rule is that, wherever the witness can state specifically the detailed facts observed by him, the inferences to be drawn from

them can equally well be drawn by the jury, so that the witness' inferences become superfluous. Now, since the declarant is here deceased, it is no longer possible to obtain from him by questions any more detailed data than his statement may contain, and hence his inferences are not in this instance superfluous, but are indispensable."

Appellant cites the case of *Commonwealth v. Fugmann*, 330 Pa. 4, 198 A. 99. This case is easily distinguished from the instant case. In the *Fugmann* case, when the victim of a plan to kill pried open the lid of a box which was sent to him through the mails, a violent explosion took place which caused him fatal injuries. Shortly after the explosion took place the victim's wife asked him what had happened and he said, "Fugmann did this". Fugmann was nowhere in sight and this statement of the victim was a surmise based upon previous relations between him and Fugmann. In the instant case the victim and her alleged slayer were in close proximity to each other and she was in a position to judge from the facts which she had preserved through her senses whether or not the shooting for which her husband was responsible was done intentionally or by accident. In *Commonwealth v. Werntz*, 161 Pa. 591, 29 A. 272, a declaration was offered as part of the res gestæ made by a victim of a stabbing. The declarations were held admissible because they were made "by the party best informed and most interested". In the instant case the dying declaration as to whether or not the killing was accidental or intentional was made by the person best qualified to know the truth. It was based not upon surmise, but upon observation. There was no error in the admission of Mary Peyton's statement as a dying declaration. All the assignments of error from the fifth to the tenth inclusive which relate to the admission of the dying declaration of the deceased are overruled.

The eleventh assignment of error is based on the admission in evidence of two photographs of the nude

body of the deceased showing the gunshot wound over the left breast. When these photographs were offered in evidence counsel objected to their admission on the grounds inter alia: "They are offered for one purpose and for one purpose only and that is to horrify the jury and create prejudice against this defendant."

The admission of photographs in a homicide case showing the body of the deceased is largely within the discretion of the trial judge and an error will not be predicated by this Court on the admission of such exhibits unless there is a flagrant abuse of discretion. The practice of admitting such exhibits unless they have essential evidentiary value is condemned. When the facts that these exhibits would tend to prove can be proved by testimony without the use of photographs which tend to excite the emotions of those who view them, such testimony should be used exclusively and photographs should not be admitted. However, if such photographs are necessary to establish a fact, they are not to be excluded merely because of their shocking nature.

The twelfth assignment of error is based on the admission of testimony of other crimes alleged to have been committed by this defendant against his wife. Grace Wank was called as a witness and she testified that two and one-half years previously she "worked for the Peytons as a waitress", and on one occasion she saw Peyton "beat her (his wife) terribly and there was blood flying and he just blackened her eyes and cut her all up just like fighting a man in the street." She also testified that she had heard Peyton three or four times threaten to shoot his wife. She heard him say, "Someday, Mary, I am going to shoot you." Miss Wank further testified: "She [Mrs. Peyton] showed me her body and her body from her ankles to the top of her head was black and blue, and she said Charlie beat her up." On motion the last part of this answer was "stricken from

the record" and the jury instructed to "disregard it as hearsay." [1]

There is no merit in this assignment of error and it is overruled. 30 C. J. 372, p. 157, states: "Evidence as to ill will, prior difficulties, and other circumstances characterizing the disposition and attitude of defendant and deceased toward each other is, subject to the general rules as to competency and relevancy, admissible as bearing upon questions of malice and intent . . ."

13 R. C. L. 216, page 912, makes the following statements in respect to evidence as to the relations between

---

[1] This statement could well have been retained in the record. The fact that Mrs. Peyton's body was "black and blue" at the time stated was admissible, but without Mrs. Peyton's explanation of this discoloration the fact had no probative value. Wigmore on Evidence, Third Edition, Vol. 6, Sec. 1772, page 190-191 says of "utterances forming a verbal part of an act": "A second kind of situation in which utterances are not offered testimonially arises when the utterance accompanies conduct to which it is desired to attach some legal effect. The conduct or act has intrinsically no definite significance, or only an ambiguous one, and its whole legal purport or tenor is to be more precisely ascertained by considering the words accompanying it. The utterance thus enters merely as a verbal part of the act, or, in the common phrase, a 'verbal act.'" He cites, inter alia, the case of *Patten v. Ferguson*, 18 N. H. 528, where Chief Justice PARKER says: "Here it is admitted that neither the fact nor the declaration, standing alone, are evidence; and when put together it is the declaration which is significant, and not the fact. The fact was of no importance standing alone; and the declaration, standing alone, was incompetent. When they are united, the unimportant fact is . . . used as a vehicle to introduce the important declaration." In *Lund v. Tyngsborough*, 9 Cush. 36, 42, it was stated: "when the act of a party may be given in evidence, his declarations, made at the time, and calculated to elucidate and explain the character and quality of the act . . . are admissible in evidence." In *Eaton v. N. Y. Life Ins. Co. of N. Y.*, 315 Pa. 68, 172 A. 121, we held that what the insurance agent said and what the insured (later deceased) said at the time the agent made manual delivery of the policy was admissible in evidence. In that case we quoted *Wright v. Tatham*, 5 Cl. & F. 670, 693 where Judge COLERIDGE stated: "The act itself being admissible, whatever accompanies it and serves to explain its character is relevant and admissible also."

the parties in homicide cases: "In almost any situation —whether the fact of killing is denied, or whether self-defense is pleaded, or whether it is contended that by reason of provocation the killing is reduced to manslaughter—proof of the previous relations of the prisoner and the deceased, whether friendly or hostile or whatnot, is relevant and competent."

In *Commonwealth v. Barnak*, 357 Pa. 391, 414, this Court cited with approval the case of *Commonwealth v. Jones*, 269 Pa. 589, 113 A. 57, in which it was held that a course of ill treatment covering years, with actual assaults, was admissible. In *Commonwealth v. Crossmire*, 156 Pa. 304, 27 A. 40, the Court also held that where the defendant was tried for the murder of his mother evidence was admissible showing that he frequently quarreled with her and that on one occasion he made an assault on her. They also cited *Commonwealth v. Minnich*, 250 Pa. 363, 95 A. 565 where it was held that "all declarations of personal hostility are admissible in evidence as showing malice and tending to show the criminal intent charged."

No other assignments of error require discussion. They are all overruled. The defendant received a fair trial before an able and impartial judge. The evidence warrants the belief that the defendant intentionally murdered his wife. The fact that he escaped conviction of murder in the first degree cannot be attributed to any weakness in the commonwealth's case.

The judgment is affirmed.