Commonwealth *v.* Plubell, Appellant.

·Argued March 19, 1951. Before DREW, C. J., STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

*William C. Chase,* for appellant.

*Joseph A. Dague,* District Attorney, with him *Dan P. Arnold,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE JONES, May 21, 1951: ·

The appellant was found guilty of voluntary manslaughter upon the trial of an indictment charging her with the murder of her husband. She moved in arrest of judgment and also for a new trial. Both motions were refused and the court thereupon entered judgment of sentence on the verdict from which the defendant has appealed. The motion in arrest of judgment has been abandoned and properly so; it was plainly without merit.

The alleged errors upon which the appellant relies are (1) the trial court's rejection of testimony as to voluntary statements, favorable to the defendant, which the victim allegedly made a few minutes after he had received his fatal wound and, also, while on his way to and at the hospital where he died within two hours of his wound and (2) the holding of a conference by the court with counsel in chambers during the progress of the trial, out of the presence of the defendant, relating to the above-mentioned exclusion of testimony.

The homicide took place between 5 and 6 o'clock on a Saturday afternoon in December in the one-story dwelling of the appellant and her husband, Earl Plubell, in Lawrence Township, Clearfield County, adjoining the Borough of Clearfield. The killing climaxed quarreling between the Plubells which had begun at the time of the husband's return home around 4 P. M. from Clearfield where, in company with one Maines, he had visited and patronized several drinking establishments. He brought Maines home with him and confronted his wife with alleged statements of Maines reflecting on her chastity  Mrs. Plubell repudiated the imputations and Maines denied that he had said any such things. That matter apparently ended there. However, the

quarreling was subsequently renewed and terminated in the fatal wounding of Plubell. In order to place in proper perspective the evidentiary question which the appellant raises, it is necessary to relate some of the sordid circumstances leading up to, attending and following the infliction of the mortal injury as testified to at trial.

Plubell had continued to drink beer at home and was in an irritable and belligerent mood. At one time he threw his wife to the floor of the dining room and struck her while she lay there. In the final altercation, which took place in the kitchen, according to the Commonwealth's only eyewitness, an eleven-year old girl, Mona Jean Wright, Plubell hit his wife in the face and backed her up against a wall. He grasped a carving or bread knife lying on the kitchen table and threw it at her, barely missing her body. He picked up the knife from the floor, where it had fallen after striking the wall, and handed it to her with the challenge, "Now, stab me, God damn you, if you want to." When the witness was asked what then happened, she replied that Mrs. Plubell "stabbed Earl" and, again, that she "stuck him". The defendant claimed the stabbing was accidental, that when she had hold of the knife, her husband lunged at her and the knife entered his body. In any event, he received a knife wound in the right chest to a depth of slightly more than five inches which caused a hemorrhage of the lung from which he bled profusely. Mrs. Plubell called Walter Wright (Mona's father) who was in the dining room adjoining, telling him that she had cut Earl and that Wright should call a doctor. Wright hurried into the kitchen and, seeing Plubell standing there with his shirt open and blood flowing from the wound to the floor, replied, "Doctor, hell, he needs an ambulance." Plubell's own comment was,—"By God, Cotton [Wright's nickname], she got me that time." Wright ran to a nearby neighbor's,

where there was a telephone, directed that an ambulance be summoned and immediately ran back to the Plubell house, all in a space of two to three minutes. By that time, Plubell, weakened from loss of blood and attendant shock, was holding on to the sink. Wright placed his arm about him and eased him onto the floor. The ambulance arrived within ten minutes and returned in about the same time to the hospital where the patient was admitted at 5:50 P.M. and died an hour and a half later. In addition to the driver of the ambulance, three men, including Wright, accompanied Plubell to the hospital. He was received upon arrival there by a doctor and nurse. All of these people heard the wounded man make statements concerning the circumstances of his injury which the court excluded when offered by the defendant.

At trial, Mona Jean Wright, after having testified to Plubell's statement—"By God, Cotton, she got me this time"—was asked by defendant's counsel in cross-examination whether she had not also heard Plubell say to her father that "it [i.e., the stabbing] is as much my fault as it is hers." The question was objected to by the district attorney as not proper cross-examination, but the learned trial judge overruled the objection and the witness answered, "No." When Walter Wright later took the stand as a Commonwealth's witness, he also testified to Plubell's remark about the defendant's having "got [him] this time" but, when asked in cross-examination whether Plubell had said anything else to him in the kitchen following the stabbing, the district attorney objected and the court sustained the objection on the ground that the matter sought to be elicited was not proper cross-examination. We think the action of the court in such regard was harmful error.

The learned trial judge thought that the statement addressed by Plubell to "Cotton" that "she got me this time" was a part of the res gestae but that what he said

to Wright upon the latter's return after an absence of two or three minutes in summoning the ambulance did not so qualify evidentially. The expression, "she got me this time", is susceptible of several different meanings. As a statement of bare fact that his wife had seriously wounded him, it was no doubt admissible as res gestae. But, it also had an accusatory connotation serving to impute intent and malice to the wife. In that sense, it was not res gestae and, therefore, not admissible as such. It is unnecessary, however, to decide whether or not any of the deceased's statements were part of the res gestae. They were at least admissible as dying declarations. It is true that the district attorney argues that the subsequent statements of the victim, which the defendant offered in evidence, and the court excluded, were not admissible as dying declarations for the reason that there was no *direct* testimony that Plubell was about to die and that he knew it. On that basis, the earlier statement addressed to "Cotton" would, *a fortiori*, be inadmissible as a dying declaration. We think, however, that the evidence concerning Plubell's wounded condition amply justifies the conclusion that the statements made by him, from the time of the one addressed to "Cotton" to the time of his death, were admissible as dying declarations subject, of course, to their relevancy and materiality.

The character of the wound and its immediate and evident effect on the victim were such as to impress him, as it did those about him, with awareness of his impending and fast-approaching death. It is unnecessary to detail the unmistakable evidences of that fact. They were quite sufficient to satisfy the law's requirements in the circumstances that the declarant's frame of mind was induced by a recognition of his imminent dissolution. As was said in *Commonwealth v. Peyton*, 360 Pa. 441, 447-448, 62 A. 2d 37,—"In Commonwealth v. Puntario, 271 Pa. 501, 505, 115 A. 831, this Court held that the nature

of the victim's wounds was such in itself as to justify the conclusion that the deceased was aware of his impending death. In that case the opinion writer, Justice SADLER, quoted the following from 1 R.C.L. 546: ' "It is well settled that the sense of impending death which the dying person must have had in order to render a dying declaration made by him admissible in evidence may be inferred from the nature of the wound or the state of his illness without any express declaration to show that he was sensible of impending death." ' " This was followed by a quotation to similar effect from Wigmore on Evidence, Third Ed., Vol. V, §1442; see also *Commonwealth v. Guida*, 298 Pa. 370, 376, 148 A. 501, and cases there cited.

The admissibility of statements, which qualify as dying declarations, is otherwise to be determined by the ordinary standards of legal evidence: *Commonwealth v. Fugmann*, 330 Pa. 4, 17, 198 A. 99. But, that does not mean that dying declarations which contain inferences and conclusions of the declarant from facts which he knows but does not state are inadmissible. In *Commonwealth v. Peyton*, supra, Chief Justice MAXEY quoted with approval and applied (pp. 448-449) Wigmore on Evidence, Third Ed., Vol. V, §1447, to the effect that " 'The Opinion rule has no application to dying declarations. The theory of that rule is that, wherever the witness can state specifically the detailed facts observed by him, the inferences to be drawn from them can equally well be drawn by the jury, so that the witness' inferences become superfluous. Now, since the declarant is here deceased, it is no longer possible to obtain from him by questions any more detailed data than his statement may contain, and hence his inferences are not in this instance superfluous, but are indispensable.' " In the *Peyton* case the declarant had first said that her husband *accidentally* shot her, but

later, when she was *in extremis,* a detective asked her whether the shooting was accidental or on purpose and she replied "On purpose." It was held that that statement "was based not upon surmise, but upon observation" since the declarant was in a position to judge from what she had observed through her senses whether the shooting was done intentionally or otherwise and that, therefore, it was proper to admit the statement in evidence as a dying declaration. Again, in *Commonwealth v. Perry,* 364 Pa. 537, 540, 73 A. 2d 425, we said it was for the jury to say, under the evidence in that case, whether the fatally wounded wife's statement that her husband's shooting of her "was planned" was a mere conjecture on her part based upon her prior relations with the defendant or upon what she had observed in connection with the shooting. The instant case is not to be distinguished from the *Peyton* and *Perry* cases on the point now under consideration.

The vice in the exclusion of the victim's statement, taking upon himself a share of the responsibility for the stabbing, was the more aggravated because the prior accusatory declaration by the husband had already been received in evidence in the Commonwealth's case and, further, defendant's counsel had been permitted, over the Commonwealth's objection, to interrogate Mona as to whether she had heard the later statement but, when "Cotton" Wright took the stand for the Commonwealth, defendant's counsel was not allowed to question him concerning that statement. The prejudicial effect to the defendant, inherent in the situation thus created, is manifest.

The declarations of Plubell to the occupants of the ambulance who accompanied him to the hospital were equally competent but only to the extent of his statement that the stabbing was as much his fault as it was his wife's. His expressions of desire that his wife be not

prosecuted were incompetent and, therefore, inadmissible even as dying declarations: see *Commonwealth v. Bednorciki*, 264 Pa. 124, 127, 107 A. 666, quoting from 16 Corpus Juris, p. 641. The further statements of the deceased in the presence of the doctor and nurse at the hospital that, "It was a family quarrel", or "family trouble" were too vague and indefinite to be either relevant or material even if competent.

In the view we take of the trial court's rejection of the victim's statements made following the stabbing as to the persons responsible for it, it becomes unnecessary to consider or pass upon the appellant's remaining complaint of the conference which the trial judge and counsel had in chambers, out of the presence and hearing of the defendant and likewise the jury, with respect to the admissibility of the excluded testimony which the record fully and correctly reflects.

Judgment reversed and a new trial granted.

Mr. Justice BELL dissents.