## Commonwealth *v.* Knable, Appellant.

Argued November 14, 1951. Before DREW, C. J., STERN, STEARNE, BELL, LADNER and CHIDSEY, JJ.

*John D. Faller, Jr.,* for appellant.

*William R. Mark,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, January 7, 1952:
Appellant alleges approximately twenty trial errors but it will be necessary to refer to only two of them.

Defendant, a married woman, was indicted for the killing of Herbert Lemin, with whom she had been living on and off for two years. During this time they had frequent quarrels, and according to her testimony, he beat her up several times and threatened to kill her.

On the day of the shooting they had numerous quarrels. She asked him to give her his gun and when he refused she took it from him. She pulled the trigger, couldn't make it fire, but after he fixed it, she pulled the trigger again and the gun fired. When she refused to give him the gun, according to her, he struck her, threw her to the ground twice and took the gun.

The Commonwealth proved by a statement of Lemin to the doctor, which was not objected to, that "he was seated in his car when his girl friend, Helen Knable of Cleversburg, Pa., reached in the window and shot him with the revolver". Defendant signed on September 5, 1950 a confession in which, after stating that Lemin twice threw her to the ground, she said: "Herbert then got into his car and sat down behind the wheel. The car door on his side was open, and I walked over to the door and kept on arguing with him about the gun. I told him that he could not have the car unless he gave the gun to me. Finally, he handed the gun to me, and I closed his door shut. At this time, we started to argue about the fellow who had taken me to the dance at the Cashtown Hotel on August 19, 1950. Herbert kept on harping about my running around, and I told him that a couple of his girls needed something done to them too. Herbert told me that I was too yellow to do anything and that made me mad. All the time that we were arguing, I had my both arms on the car door and window was rolled down. I pointed the gun toward him and pulled the trigger. After I pulled the trigger of the gun, I opened the door and Herbert rolled out. As Herbert rolled out, I told him that maybe this will learn you a lesson.

He said Shorty, *if you never did anything for me, take me to a doctor.* I helped him get up on his feet and helped him get into the car."

On the witness stand defendant told a different story, namely, that Lemin opened the door and was about to get out of his car; she was afraid that he would beat her up again, so she shot him in self-defense. The jury obviously disbelieved her story of self-defense and found her guilty of manslaughter.

The trial judge, who believed that the defendant was fortunate not to have been (indicted for and) convicted of murder, refused her motion for a new trial and imposed an indefinite sentence at the State Industrial Home at Muncy.

The appellant raises two important questions: (1) Was Lemin's so-called dying declaration, *"Don't let her get away with it"*, improperly admitted in evidence, and (2) was it reversible error for the trial judge to go into the jury room in the absence of the defendant?

We shall discuss these seriatim.

Defendant admittedly shot Lemin in the abdomen with a revolver about five fifteen p.m. on August 31. She then took him to a doctor who ordered an ambulance which rushed him to the hospital. Dr. Hudson testified that when he first saw Lemin at the hospital, at about 7:15 o'clock that evening, "He was in extreme shock, perspiring, had lost considerable blood and was actually at a point not too far from death, requiring blood transfusions and immediate surgery in order to prevent his death immediately." When asked, "Was there anything concerning his visage or his actions which indicated that he thought he was going to die?", Dr. Hudson answered, "Yes, sir." "Q. What was it? A. He was very apprehensive, restless." The doctor testified that he performed a long and very serious operation; that it was impossible to remove the bullet, and that Lemin died eight days later from

wounds caused by the bullet. There then followed this examination: "Q. Doctor, you asked him certain questions concerning how he was wounded, did you not? A. Yes, sir. Q. Following those questions, did he make a statement concerning whether he was dying or not? A. Yes, sir. Q. Go ahead Doctor, what was the statement? A. 'Don't let her get away with it.' " Defendant's counsel objected and moved that the answer be stricken; the court overruled the objection and noted an exception.

In the light of all this evidence—which was the only evidence in the case concerning the so-called dying declaration—was Lemin's statement "Don't let her get away with it" admissible as a dying declaration?

Dying declarations of the deceased concerning the circumstances of his injuries are admissible in the trial of a person accused of killing him. To validate a dying declaration it is not necessary that the wounded man expressly say that he knows that he is dying; it suffices, if at the time the declaration is made, the declarant believed he was in fact dying and that death was imminent, and death did actually ensue. The admissibility of such declaration depends primarily upon the state of the declarant's mind: *Commonwealth v. Lockett*, 291 Pa. 319, 323, 139 A. 836; *Commonwealth v. De Leo*, 242 Pa. 510, 89 A. 584. In passing upon the admissibility of an alleged dying declaration all the attendant circumstances should be considered, including the weapon which wounded him, the nature and extent of his injuries, his physical condition, his conduct, and what was said to and by him: *Commonwealth v. Lockett*, 291 Pa. 319, 139 A. 836; *Commonwealth v. Puntario*, 271 Pa. 501, 115 A. 831; *Commonwealth v. Peyton*, 360 Pa. 441, 62 A. 2d 37; *Commonwealth v. Plubell*, 367 Pa. 452, 80 A. 2d 825; Wigmore on Evidence, Third Edition, Vol. 5, Sec. 1442. Whether the attendant facts and circumstances of the case

warrant the admission of a statement as a dying declaration is in the first instance for the court, but, when admitted, the declarant's state of mind and the credibility, interpretation and weight to be given his statement are for the jury under proper instructions: Cf. *Commonwealth v. Puntario,* 271 Pa. 501, 115 A. 831; *Commonwealth v. Lockett,* 291 Pa. 319, 139 A. 836; *Commonwealth v. Gardner,* 282 Pa. 458, 128 A. 87; *Commonwealth v. Winkelman,* 12 Pa. Superior Ct. 497; *Commonwealth v. Brewer,* 164 Mass. 577, 42 N. E. 92, Wigmore on Evidence, Third Edition, Vol. 5, Sec. 1451b. Moreover, if declarant believed he was about to die, his statement would be competent and admissible, even though he lingered for ten days thereafter: *Commonwealth v. Lockett,* 291 Pa., supra.

From Lemin's dramatic appeal to defendant for help, and from his wound, his loss of blood, and his physical condition, it is manifest that he thought he was about to die.

But even if deceased was aware of his impending death, it does not follow that every statement he makes under those circumstances is admissible as a dying declaration. The line of demarkation between admissible and inadmissible statements is sometimes shadowy. The inflammatory nature of the declaration will not bar it if it is otherwise admissible. Moreover, dying declarations which contain inferences and conclusions of the declarant from facts which he knows or observes but does not state may be admissible; and the opinion rule has no application to dying declarations: *Commonwealth v. Plubell,* 367 Pa. 452, 80 A. 2d 825; *Commonwealth v. Peyton,* 360 Pa. 441, 62 A. 2d 37; *Wigmore on Evidence,* Third Edition, Vol. 5, Sec. 1447.

The closest case we have found to the present one is *Commonwealth v. Plubell,* 367 Pa., supra, where we held *inadmissible* a dying declaration that the victim did not wish the defendant (his wife) to be prosecuted.

We are not unmindful that the following statements have been held to be admissible as "dying declarations": "She got me that time" (*Com. v. Plubell,* 367 Pa., supra); "She shot me on purpose" (*Com. v. Peyton,* 360 Pa., supra); "The shooting was planned" (based upon what decedent had observed in connection with the shooting, *Com. v. Perry,* 364 Pa. 537, 73 A. 2d 425); "The shooting was wilful and without palliation" (*Com. v. Lockett,* 291 Pa. 319, supra).

These cases are clearly distinguishable because the dying declaration in this case did not concern the circumstances of the victim's injuries, nor was it a statement of fact, nor a conclusion from facts and circumstances which he observed.

While the exact meaning of the dying declaration may not be clear, we believe it was merely an adjuration to prosecute and convict the woman who shot him. It is therefore inadmissible as a dying declaration and for this reason the judgment must be reversed.

The second important question raised by the appellant is whether it was reversible error for the trial judge to enter the jury room in the absence of the defendant, even though he did so in order to ascertain the wishes of the jury, and even though his colloquy with them did not harm the defendant. The trial judge in his opinion says that he went to the jury room with the approval of both counsel for the defendant and the District Attorney; counsel for defendant has no recollection of ever having approved this procedure. We strongly disapprove of any such practice and adopt as the law the following statement in 23 C. J. S. 1028, sec. 1366: "The judge may recall the jury and communicate with them in open court, . . . but he cannot properly go to the jury room to communicate with them nor remain in the room while they are deliberating, nor send the court stenographer into the jury room to read the charge in the absence of accused and his coun-

sel; . . .". However in this case we consider this error insufficient to warrant a reversal: *Com. v. Kelly,* 292 Pa. 418, 141 A. 246.

Judgment reversed and new trial granted.