## Commonwealth v. Brown, Appellant.

614

Argued March 18, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Harold K. Wood*, with him *Reilly & Wood*, for appellant.

*Samuel J. Halpren*, Assistant District Attorney, with him *John E. Stively*, District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, April 26, 1957:

A narrow but very important question is raised in this case: Was it reversible error to charge the jury that a dying declaration in a homicide case has the same effect as if it were made under oath?

Mary E. Brown was indicted for murder but was convicted of voluntary manslaughter. Defendant and Vivian Gay, apparently in a fit of jealously, attacked Dorothy Francis, the decedent, on the street. Dorothy Francis was killed by a knife wound in the breast. Who stabbed her was the crucial factual question, Vivian Gay blaming Mary Brown and Mary Brown blaming Vivian Gay. Two eyewitnesses testified that defendant, Mary Brown, attacked Dorothy Francis with a knife, while Vivian Gay beat her with a golf club.* Defendant denied that she had a knife or that she stabbed Dorothy Francis, and testified that Vivian Gay was the one who had the knife and inflicted the mortal wound. Vivian Gay testified that she saw Mary Brown, the defendant, stab Dorothy Francis, and that while they were both in jail, defendant admitted to her that she had stabbed Dorothy Francis. Moreover, Dorothy Francis, just before her death and at a time when she knew she was about to die, made an alleged dying declaration that Mary Brown, the defendant, stabbed her.

The Judge's charge to the jury was lengthy and very able with the one possible exception which is here alleged for error, namely, that if the jury were satisfied beyond a reasonable doubt that Dorothy Francis believed she was about to die and had no hope of recovery when she stated that Mary Brown stabbed her "you can give that statement the same effect as though it were made under oath". Because of the conflict of evidence, the Court's charge on this point was important.

The subject of dying declarations and the restrictions and limitations on their admissibility were analyzed and reviewed by this Court in *Commonwealth v.*

---

\* Vivian Gay was convicted of aggravated assault and battery.

*Knable,* 369 Pa. 171, 175-176, 85 A. 2d 114. In that case the Court pertinently said:

"Dying declarations of the deceased concerning the circumstances of his injuries are admissible in the trial of a person accused of killing him. To validate a dying declaration it is not necessary that the wounded man expressly say that he knows that he is dying; it suffices, if at the time the declaration is made, the declarant believed he was in fact dying and that death was imminent, and death did actually ensue. . . . In passing upon the admissibility of an alleged dying declaration all the attendant circumstances should be considered, including the weapon which wounded him, the nature and extent of his injuries, his physical condition, his conduct, and what was said to and by him: Commonwealth v. Lockett, 291 Pa. 319, 139 A. 836; Commonwealth v. Puntario, 271 Pa. 501, 115 A. 831; Commonwealth v. Peyton, 360 Pa. 441, 62 A. 2d 37; Commonwealth v. Plubell, 367 Pa. 452, 80 A. 2d 825; Wigmore on Evidence, Third Edition, Vol. 5, Sec. 1442. Whether the attendant facts and circumstances of the case warrant the admission of a statement as a dying declaration is in the first instance for the court, but, when admitted, the declarant's state of mind *and the credibility, interpretation and weight to be given his statement are for the jury** under proper instructions: [citing cases]."

However, that case did not answer the exact question here involved, and there are relatively few cases and text authorities directly on the point.

Dying declarations in homicide cases have from ancient times been admitted in evidence either (1) because of solemnity**—the solemnity of the occasion

---

* Italics throughout, ours.

** *Brown v. Commonwealth,* 73 Pa. 321; *Rudisill v. Cordes,* 333 Pa. 544, 5 A. 2d 217; *Wright v. Commonwealth,* 109 Va. 847, 65

and the fear of punishment in the hereafter if one tells a lie just before death, or (2) because of necessity*— since the victim of the homicide cannot testify its admission is necessary to protect the public against homicidal criminals and prevent a miscarriage of justice. However, a number of authorities point out that while it is a substitute for an oath and its credibility and weight is for the jury, it is merely hearsay and is not the equivalent of nor does it have the same value or weight as the testimony of a witness given under oath in open Court which, of course, is subject to cross-examination. In our judgment, both grounds justify the admissibility of dying declarations; the value and weight of such declarations (if the trial Court admits them), all authorities agree, are for the jury.**

If a dying declaration is not the equivalent of sworn testimony under oath, what weight is the jury to give it if they believe it, and how can a trial Judge express to them the difference in value and weight of dying declarations as contrasted with sworn testimony? Would not any such attempt merely serve to confuse the jury?

Some authorities which limit the value and weight to be given to dying declarations, point out that the declarant may be influenced by hatred or revenge or similar unworthy motives,*** but this is equally appli-

---

S.E. 19; *O'Boyle v. Commonwealth*, 100 Va. 785, 40 S.E. 121; *Josey v. State*, 137 Ga. 769, 74 S.E. 282.

* *Railing v. Commonwealth*, 110 Pa. 100; *People v. Falletto*, 202 N.Y. 494, 96 N.E. 355.

** *Commonwealth v. Delfino*, 259 Pa. 272, 102 A. 949; *Commonwealth v. Gardner*, 282 Pa. 458, 128 A. 87; *Commonwealth v. Jones*, 341 Pa. 541, 19 A. 2d 389; *Commonwealth v. Knable*, 369 Pa. 171, 85 A. 2d 114; *State v. Valencia*, 19 N.M. 113, 140 P. 1119.

*** *Railing v. Commonwealth*, 110 Pa. 100; *Commonwealth v. Gardner*, 282 Pa. 458, 128 A. 87; *People v. Falletto*, 202 N.Y. 494, 96 N.E. 355.

cable to any despicable character who takes the witness stand. " 'When every hope of this world is gone, when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth, a situation so solemn and awful is considered by the law as creating the most impressive of sanctions.' 1 Wharton's Criminal Law, §669; 3 Russell by Greaves 250; 1 Greenleaf, §§156, 162, 346; 1 Taylor on Evidence 616.": *Brown v. Commonwealth*, 73 Pa. 321, page 327.

Expressed in other words, when a person is faced with death which he knows is impending and he is about to see his Maker face to face, is he not more likely to tell the truth than is a witness in Court who knows that if he lies he will have a locus penitentiae, an opportunity to repent, confess and be absolved of his sin? For all these reasons, we believe, weighing all the pros and cons, that it is in the best interests of the public that a dying declaration should be considered as the equivalent of testimony given under oath in open Court. However, from a realistic point of view, it would seem advisable for a trial Judge to omit, in his charge to the jury, any comparison and merely say that the question whether the declarant believed he was dying at the time he made the declaration, and the credibility, interpretation and weight to be given his statement under the attendant facts and circumstances of the case, are for the jury.

Appellant relies upon *Commonwealth v. Gardner*, 282 Pa. 458, 128 A. 87, and *Commonwealth v. Lockett*, 291 Pa. 319, 139 A. 836. In *Commonwealth v. Gardner*, 282 Pa., supra, the declarant, during the period when she was dying, made several conflicting statements and consequently her credibility was considerably shaken. Perhaps for this reason, the Court said: "Dying declarations are admissible under certain cir-

cumstances, but if they are admissible they are not to be considered as given under the sanctity of an oath." In *Commonwealth v. Lockett*, 291 Pa., supra, a dying declaration which was made in the form of an affidavit was admitted in evidence. Nevertheless, the Court said (pages 322-323) : ". . . This grave situation *supplies* the place of an oath taken in open Court, although the statement so given is not considered the equivalent of sworn testimony, as the declarant is not brought face to face with the accused and the opportunity to cross-examine is lacking . . .".

A dying declaration should in our judgment be given the same value and weight as sworn testimony, and any statement to the contrary in prior cases will not be followed by us.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion in this case helps to perpetuate the myth that dying persons always tell the truth. Despite history, general observation, and daily chronicles which record countless examples of evidence to the contrary, the fable persists that every person, including the worst villians of mankind, standing on the brink of eternity, allow only pearls of veracity to fall from their lips. Adolf Hitler told some of the most monumental falsehoods which ever disgraced the human race (even for that congenital prevaricator), as he prepared to kill himself in the subterranean bunker in Berlin in the closing days of his conscienceless life.* Napoleon Bonaparte, with a fertility which surpassed Baron Munchausen's, invented memorabilia which still confuse historians, as he made ready for his last Water-

---

* Ten Days to Die, Doubleday, New York, 1950.

loo. Nor is it recorded that Herod, Nero, Caligula, Tamburlaine, Attila, Genghis Khan, Alaric the Goth, Mithridates, Ivan the Terrible, Stalin or any of the other infamous scoundrels down through the ages regaled their entourages with stories on the moral verities as they were ferried across the river Styx.

The perpetrators of all the unsolved murders in the world are liars who go down to their grave wholly oblivious to the angels of truth crying for confession and revealment. Atheists who repudiate belief in a Supreme Being have no inhibitions against wagging their tongues in spurious tales as death rattles in their throats. Godless ruffians, feudists, bandits, gangsters, all bent on their greedy, rapacious and vengeful deeds, have no scruples about dying as they lived,—with hate, dishonesty, and deceit in their mouths.

In her recently published book on the life and times of Sir Edward Coke,* Catherine Drinker Bowen relates how in Lord Cobham's accusation of treason against Sir Walter Raleigh it was generally accepted that, because Lord Cobham was himself soon to be executed, his charges could only represent truth: "Impossible that a man with death so close upon him would lie thus to the Lords. What had he to gain thereby." Yet it developed later that Cobham had lied because he hoped thereby to receive sovereign clemency. He in fact later did escape the death penalty.

To say that the world can invariably depend on the truth-speaking accuracy of a dying person is to ignore the most fundamental, physiological facts. Putting aside for the moment the undependability of knaves in their last, gasping moments, it should be manifest on the slightest reflection that even the statements of the most honorable persons on their deathbeds are not nec-

---

* The Lion and the Throne: Little Brown & Co., 1957.

essarily reliable. A dying person is at the ebb of his physical and mental resources. With every corpuscle struggling for survival, with every brain cell ringing in alarm, with the lungs fighting for that extra breath of air which may prolong the buoyancy of the ship of life sinking rapidly in the dark waves of oblivion, the mind is not always capable of assembling the forces of memory, concentration, and lingual control so as to guide speech into the channels of rational utterance. To juridically announce that a dying statement is the superlative demonstration of revealed fact is to glorify error, honor fallacy, and place the seal of infallibility on the most fallible of human assertions.

Moreover, it is not always certain that a person in extremis is consciously aware that the candle is about to be extinguished or will admit to himself that his body is reverting to mortal dust. It is an assumption which has never been proved, nor can it be proved, that when a moribund speaks, he knows his minutes are numbered. He may declare that he is dying, but with the exception of those who are preparing for suicide or execution, it cannot be established that with the very acknowledgment of anticipated death, he is not hoping and expecting that an untapped reservoir of strength may prolong what no one surrenders voluntarily.

These observations are so obvious and so irrefutable that one cannot help but wonder why the phantasy has grown that the last words heard above the tumult of the last battle for survival should be the last word in precision, accuracy, and trustworthiness. This illusion has come floating down the centuries, with each generation further inflating its ever-expanding balloon proportions, and the time had arrived to burst the age-ridden fallacy which almost amounts to superstition. I was hoping that, with the excellent opportunity before it to do so, this Court would with the lance of

622

logic pierce the bag of this spurious dirigible and bring it down to the terra firma of realism from which it should never have ascended.

It is bad enough to assert that a dying declaration represents the highest expression of certitude but to say, as the Majority of this Court says in the case before us for review, that dying words must be invested with all the solemnity and sanctity of a statement made under oath, approaches absurdity. More than that, such a ruling is unjust because it clamps about the neck of the accused a yoke which he cannot possibly shake off. He is accused by a person he cannot see, he is charged with words he cannot refute, he is attacked with an accusation he cannot counter-attack through cross-examination. Such a ruling requires juries in effect to accept fallible evidence as infallible proof; it calls upon juries to look upon dying speeches as if they were delivered at the altar of forthrightness when in fact they may have been concocted in the laboratory of cunning and deceit.

That there is something awesome about final pronouncements is not to be questioned, but the awesomeness does not assure that an incense lamp of integrity has been lighted at the bedside of the pronouncer. It could just as well be that the gasping speaker is projecting his voice through the smoke of dissimulation. An expiring murderer could have as much motive to falsify as he had to kill. If the Fifth Commandment did not deter him from slaughtering his fellow-man, the Eighth Commandment would present no barrier to his bearing false witness. One who has already smashed the temple of life would find no difficulty in upsetting the pedestal of truth. Hence, the absolute need in treating of dying declarations to present the facts as they are, unvarnished with preconceived notions of sanctity and dependability.

Let the jury know just what occurred and let them decide whether the declarant, in the calm, dispassionate atmosphere of a tribunal of law, would have testified in the same manner as he spoke amid all the passions, fears, and pain which assailed him at the moment of his fatal utterance. Let the jury decide whether the declarant would be as categorical in his statements if he were in a courtroom, where he is subject to the laws of perjury, as he was when he was beyond the reach of the law and the reprisal of refutation.

Of course, it could happen and it does happen, that at the very breaking of the thread of life one will speak gospel even if he never spoke it before. It can happen, and does happen, that as one's soul departs on the flood tide of perpetuity he may wish to leave on the shores behind him only the chapel of haloed truth, but there is nothing in the chronicles of the human race which warrants the conclusion that this is a common experience of man. The probity or falsity of what is left on the shore can only be determined by probing the circumstances which surround the launching of the craft of infinity on the seas of everlastingness.

In the case of *Commonwealth v. Gardner*, 282 Pa. 458, 470, Mr. Justice KEPHART well expressed the law which should govern evidence of this type: "Dying declarations are solemn evidence, but they are subject to the same rules as other evidence, and certainly are not to be considered as though given under the sanctity of an oath. The reason for the admission of such evidence is variously stated, but the weight of this evidence is, and always must be, for the jury, who are to consider it in the manner in which it is brought to their attention, without any added suggestion from the court, such as here appears, which has a tendency to emphasize its truthfulness by adding to the fact of im-

pending death the additional guarantee of an oath. Such a suggestion invades the jury's right to determine what weight should be given the testimony."[*]

The Majority Opinion fears that a jury could not distinguish between the weight of an unsworn dying declaration and the weight of sworn testimony in court. What is the difference between a statement given as part of the res gestae and sworn testimony in court? Judges do not charge that the jury must accept the spontaneous utterance of the victim of an automobile accident at the time of the accident as if it were spoken before a judge and jury. Why should they invest a dying declaration, which is also in the nature of a spontaneous utterance, with the solemnity of a jurat? A dying declaration would have no standing at all in court were it not that it is an exception to the hearsay rule. To now pile on that exception an additional exception by calling it a sworn statement when it is not a sworn statement at all comes, as I view it, close to depriving a defendant of due process of law. It is already too much that he is denied the constitutional right to confront an accusing witness without magnifying, beyond reality, the nature of that accusation.

The Majority Opinion says: "Some authorities which limit the value and weight to be given to dying declarations, point out that the declarant may be influenced by hatred or revenge or similar unworthy motives, but this is equally applicable to any despicable character who takes the witness stand." But there is this difference which the Majority overlooks. The "despicable character who takes the witness stand" must face the batteries of cross-examination. He may, it is true, be influenced by hatred or revenge as the

---

[*] See also: *Railing v. Commonwealth*, 110 Pa. 100; *Commonwealth v. Mulferno*, 265 Pa. 247; *Commonwealth v. Jones*, 341 Pa. 541.

dying person may be, but he cannot conceal his lies, if he is lying, under the impermeability of a shroud.

The Majority says that: "When a person is faced with death which he knows is impending and he is about to see his Maker face to face, is he not more likely to tell the truth than is a witness in Court who knows that if he lies he will have a locus penitentiae, an opportunity to repent, confess and be absolved of his sin?" The answer to this is Yes. But not all persons are like the person the Majority here describes. If they were, iniquity, injustice, tyranny, and inhumanity would disappear from the confines of the earth. It is because there are persons who defy goodness and honor and who accept the cut rates of Mr. Satan at his sulphuric supermarket rather than pay the just price which decency and justice demand, that evil still walks the earth.

In the case at bar it appears that two women, Vivian Gay and the defendant Mary Brown, armed with a golf stick and a knife, set upon one Dorothy Francis with the intention of doing her no good. Jealousy and criss-cross love affairs had fired the passions of this termagant trio and they fought desperately on the street. The arena of battle encompassed a street, a lawn, a flower garden, and a truck, around which the shrewish combatants chased one another, as testified to by the husband of Vivian Gay, apparently one of the heart-interests in the quadrangle. This pivotal figure testified that on Aug. 16, 1954 he was walking on old Lincoln Highway in Malvern, with Dorothy Francis, when Mary Brown and his wife Vivian came running toward them. At this point Vivian Gay announced: "The party is on." And it was.

The Commonwealth contended that it was Mary Brown's aggression which killed Dorothy Francis. Mary Brown testified that it was Vivian Gay who

wielded the knife. A witness by the name of George McFarlin, Jr., confirmed Mary Brown's testimony in this respect: "When I got there Mrs. Wasson was on the porch, Vivian and Dorothy were fighting and Mary was still by the truck. I came up behind Vivian and grabbed the golf club out of her hand. It is all metal, with sharp ends sticking out, it was jagged, a series of ridges. It is was a metal head and a metal shaft. It was jagged and sharp edges. I tossed it, threw it away. I went back to the flower garden and Dorothy was bending over. I picked Dorothy up, and Vivian broke back into her again. She hit her again with the knife, and all the blood came out. Dorothy was laying there. Vivian was on top of her and was hitting her."

The testimony as to what actually happened during the fatal melee was contradictory, conflicting, and generally confusing,* but at the hospital, in answer to questions put to her by a police officer Dorothy Francis replied that it was Mary Brown who stabbed her. In his charge the Trial Judge said to the jury that the statement made by Dorothy Francis was "to be received by you and considered by you just as though it were made under oath by Dorothy Francis." Later he also said: "If you so find [that Dorothy Francis believed she was dying] then you give that statement the same effect as though it were made under oath in your hearing."

There can be no doubt whatsoever that the Trial Judge's instruction—that the jury was to consider Dorothy Francis' statement as if made under oath *in their hearing*—considerably influenced the jury and probably dictated to them their verdict. The instruction relieved the jury of the worry and anguish of seek-

---

* One of the witnesses testified: "Three of them all tussling there."

ing to ascertain the actual culprit amid the tangle of testimony as to just what did occur in the gory struggle which raged and spent its fury over the suburban expanse mentioned. The jury could well have concluded that if Dorothy Francis' statement had to be accepted by them as sworn testimony, and she did say that Mary Brown killed her, who should know better than she who killed her. The Judge simplified the case for the jury, but the situation was not so simple as the Trial Judge made it. When one speaks of a dying declaration the average listener assumes that the declarant, in full possession of his faculties, coolly and clearly announces: "X shot me" or "Y stabbed me." But the picture is rarely so clearly etched, and it certainly was not so etched in this case. Mary Scott, a student nurse, who was present at the hospital when the police officer was questioning Dorothy Francis, testified that "She [Dorothy Francis] was *mumbling all the time,* but there were times when the mask was off when she was examined." (Emphasis supplied.)

While Dorothy Francis' life blood drained, and her lips mumbled as the officer questioned her, did her answers mirror the irrefutable realities of the battle and flight in which she sought to flee, hide, fight back, and escape? Did the mortal wound come from the jagged metal end of the golf stick or from the blade of the knife? These were questions which the jury should have resolved, untrammeled by the command of the presiding Judge that the muttering answers of Dorothy Francis in the hospital were to be accepted as if spoken in court with all the solemnity, dignity and guarantees vouchsafed every accused.

Even so, the jury must have still had some grave doubts because they convicted Mary Brown only of voluntary manslaughter although she had been indicted for murder. Moreover, this was her second trial.

The first jury was unable to agree on a unanimous verdict.

Apart from the injustice which may have happened to Mary Brown, I fear for the fate of other defendants who may be innocent but yet be convicted because this Court has placed its anticipated imprimatur of sworn testimony on what may be a mere matter of muttering, mumbling moribundity.