UNITED STATES of America,
Appellee,

v.

Paul Nathaniel HALL, Appellant.

No. 11789.

United States Court of Appeals
Fourth Circuit.

Argued Feb. 5, 1968.

Decided June 17, 1968.

Certiorari Denied Oct. 21, 1968.

See 89 S.Ct. 248.

842

Benjamin Lipsitz, Baltimore, Md., (Court-appointed counsel), for appellant.

Stephen D. Shawe, Asst. U. S. Atty. (Stephen H. Sachs, U. S. Atty., on the brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge:

Following a jury trial which resulted in his conviction, Paul Nathaniel Hall was sentenced to twenty years imprisonment for the robbery of a federally insured savings and loan association.[1] Although Hall's counsel has earnestly and forcefully presented this appeal, we perceive no reversible error and affirm the judgment below.

In December 1966 the office of the Fidelity Federal Savings and Loan Association (hereinafter "Fidelity" or "bank"), located just outside the District of Columbia in suburban Maryland, was robbed by two young males, both Negroes. One of the robbers, Paul Young, was arrested later the same day by Lieutenant Wallace of the District of Columbia Police Department and, sometime prior to Hall's trial, was convicted for his part in the robbery. Pursuant to an arrest warrant

Hall was apprehended in Washington, D. C., on March 6, 1967, by FBI Agent Dowling.

Prior to trial Hall's counsel had arranged to have three Negro youths who were not involved in the case seated in the courtroom and, with the court's consent, had seated Hall in the spectator portion of the courtroom rather than with his counsel at a table inside the railing. Young was also present in court. Pursuant to Hall's request the judge had ordered that the witnesses be sequestered.

At trial, Fidelity's two tellers testified to the effect that on the day of the robbery two young Negro men entered the bank and approached the tellers' counter where one of them, whose activities the Government sought to attribute to Hall, produced a business card on the back of which was written the message, "This is a holdup, keep quiet, no one will be hurt." The other man carried a small pistol.[2] One of the tellers, following brief oral directions, filled a bag with money from her cash drawer. This she handed to one of the robbers, and the two men promptly left the bank.

While on the witness stand each teller was asked to identify the robbers. The first teller, Mrs. Jones, correctly identified Young as the one who had carried the pistol, but when asked to identify Hall pointed to one Melvin Taylor, one of the three youths positioned about the courtroom by Hall's counsel. The other teller, Mrs. Dean, was unable to identify anyone. Similarly, Lt. Wallace, who testified concerning his arrest of Young on the day of the robbery, when asked to identify the man he had arrested, pointed to Taylor.

1. Hall was originally charged on a two-count indictment. The first count charged a violation of 18 U.S.C. §§ 2113(a) and 2. The second count charged a violation of 18 U.S.C. § 2113(b). However, prior to submitting the case to the jury, the court below granted the defendant's motion for acquittal as to the second count, ruling that the Government had failed to establish that the amount stolen ex-

ceeded one hundred dollars as required by § 2113(b).

2. Apparently the pistol carried by the second man, Young, was a "starter pistol" of the sort generally used by officials at races. This pistol fired only blank cartridges and was incapable of firing a ball cartridge. No emphasis was placed on this fact by counsel.

The Government's witness, Agent Dowling, identified Hall as the man he had arrested in the District of Columbia on March 6 and testified, both at a hearing before the judge in chambers and in open court, concerning the arrest and a confession which Hall made at that time. According to Dowling's testimony, he had found Hall on the evening of the arrest standing in a "furnace closet" in a house in Washington. Hall initially identified himself as Paul Gibson, but then acknowledged that he was Paul Hall. Dowling informed Hall that he was arrested for the December robbery of Fidelity, handcuffed him, and escorted him to a government automobile. Seated in the car, Dowling asked Hall if he were able to read and write, and, on receiving an affirmative reply, handed Hall a printed document the contents of which are set forth in the margin,[3] instructing him to read it aloud. When Hall had finished, Dowling asked him if he understood what he had read and if he had "any objection" to signing it. Hall replied that he understood and was willing to sign. He signed his name on the line provided for signature and Dowling signed as a witness. It is not disputed that Dowling did not advise Hall of the possible punishment if he were convicted of the crime for which he was arrested and, further, that he did not *specifically* offer him the assistance of counsel to advise with him concerning the signing of the "Waiver of Rights" form.

After Hall had signed the paper he and Dowling were seated in the rear of the car driven by Ford, another FBI Agent, and they were proceeding toward the local FBI office. Hall was questioned by Dowling concerning the robbery and, along the way,[4] Hall made a detailed oral confession of his involvement in the robbery, as the man who handed the note to the bank teller. Dowling made notes as Hall talked and later filled out a report concerning the arrest and confession which he submitted to his office. The confession, however, was not reduced to writing, and Hall signed nothing except the document mentioned above. Dowling stated that Hall seemed coherent and did not appear to be under the influence of drugs or alcohol. When they arrived at Dowling's office in Washington, Hall asked if he might use the telephone and was permitted to call his sister, the only person he desired to contact.

At no time during the proceeding against him did Hall testify, either gen-

---

3. *YOUR RIGHTS*
Before we ask you any questions, you must understand your rights.
You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer.
A lawyer will also be provided for you now, if you wish, by the Neighborhood Law Offices of the Neighborhood Legal Service Project, 416 5th Street, N.W., Washington, D.C., which you may call.
*WAIVER OF RIGHTS*
I have read this statement of my rights and I understand what my rights are.
I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.
Signed PAUL NATHANIEL HALL
Witness: Joseph E. Dowling
Special Agent FBI 3/6/67
Time: 10:41 P.M. 3/6/67

4. On the evening of the arrest Dowling was accompanied by another agent, Ford, who apparently was not actually present when Dowling located Hall and did not immediately return to the car. Although Hall signed the waiver document while Ford was still absent, Ford returned shortly thereafter, and most of Dowling's questioning took place while Ford was driving the two to the FBI office.

erally or with respect to the confession, and no evidence was introduced on his behalf. However, appropriate motions and objections were made to provide the bases for the arguments he makes in this court and to these we now turn our attention.

Hall argues, on several grounds, that the district court erred in denying his motion for judgment of acquittal as to the first count of the indictment and in submitting this count to the jury.[5] Initially, Hall contends that implicit in the government's case, insofar as it pertains to the failure of witnesses to identify him as one of the robbers, is an "intrinsic and inescapable" reasonable doubt arising from the identification evidence offered by the Government. Hall argues that the Government called "identification witnesses" for the purpose of identifying Hall as a principal or an aider and abettor in the robbery or for the purpose of identifying Young as the person aided and abetted by Hall. The confused results of these attempted identifications at trial, which certainly must have been embarrassing to the prosecution, have been outlined above. It is Hall's argument that the net effect of this evidence should be that a "reasonable juryman" confronted with such incompatible elements of proof presented by the same side must, as a matter of logic, be in doubt as to the identity of the robbers. He further suggests that in this context such a reasonable doubt might also be viewed as a lack of substantial evidence to support the conviction.

■■ While this argument may have a certain appeal as a matter of pure logic, nevertheless such facts do not warrant the granting of Hall's motion for judgment of acquittal. If the jury believed the testimony of Dowling concerning Hall's confession and that of the tellers concerning the events at Fidelity they could conclude that Hall was a guilty participant in the robbery. The record

reveals that Mrs. Dean's inability to identify anyone and the mistaken identifications by Mrs. Jones and Lt. Wallace were forcefully argued to the jury by defendant's counsel; but such failure and mistakes could not eliminate from the evidence the testimony to show that two young Negroes participated in the robbery and Hall admitted that he was one of them. What happened at this trial demonstrates that eyewitnesses can be quite confused and their identifications, at times, most unreliable. Such mistaken identifications, however, do not command a judgment of acquittal when, as here, the Government has presented also sufficient evidence which could support a jury finding of guilt beyond a reasonable doubt. As this court said, quoting from Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947):

> "The true rule, therefore, is that a trial judge, in passing upon a motion for a directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." Bell v. United States, 185 F. 2d 302, 310 (4 Cir.), cert. denied, 340 U.S. 930, 71 S.Ct. 492, 95 L.Ed. 671 (1951).

■ Hall further argues that the motion for judgment of acquittal should have been granted for a second reason: that his conviction was obtained upon his uncorroborated extrajudicial confession. Specifically, Hall contends that such independent facts concerning the corpus delicti as are admittedly here present are not sufficient to meet the requirement of corroboration since there is nothing in the record—absent his confession—to connect him in any way with the crime. It is, of course, true that a criminal conviction cannot validly rest solely upon an

5. Since the district court, as noted above in n. 1, granted defendant's motion for acquittal on the second count, the first count was the only one which went to the jury.

uncorroborated confession. See, e. g., Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954); White v. United States, 279 F.2d 740 (4 Cir. 1960). However, here there was undisputed and detailed evidence, independent of his confession, to show that a robbery of the bank had been committed and the confession of Hall was not necessary to the establishment of the crime itself. See United States v. Waller, 326 F.2d 314 (4 Cir. 1963), cert. denied, 377 U.S. 946, 84 S.Ct. 1355, 12 L.Ed.2d 309 (1964); Cutchlow v. United States, 301 F.2d 295 (9 Cir. 1962); Tyler v. United States, 90 U.S.App.D.C. 2, 193 F.2d 24 (D.C.Cir. 1951), cert. denied, 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed. 1326 (1952); Mangum v. United States, 289 F. 213 (9 Cir. 1923). See also Annot. 45 A.L.R.2d 1316, 1336 (1956); McCormick, Evidence, § 110 (1954); 4 Wigmore, Evidence, § 2070–72 (2d ed. 1923). We are mindful, as Hall argues, that the testimony which clearly established the details of a crime committed by someone came from the same witnesses who were mistaken in their identifications at trial. However, the credibility of witnesses is a matter for jury determination and the inability of the witnesses to make courtroom identifications should not impinge upon or destroy the jury's right to accept their testimony as establishing the details of the crime. This court said in United States v. Waller, supra, 326 F.2d at page 315:

> " * * *. The facts detailed therein [the confession] coincide precisely with the facts shown aliunde. There is a strong inference that the defendant could not have known of such detailed facts but for his participation in the crime. We are satisfied that Waller's confession was substantiated by corroborative evidence tending 'to establish the trustworthiness' of it. More is not required."

We thus conclude that Hall's motion for acquittal was properly denied.

Hall's next assertion of error concerns the waiver of his right to remain silent and the admission in evidence of his subsequent oral confession. In effect, Hall contends that the requirements for a constitutionally valid waiver as enunciated in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 694 (1966), are not met in this case, and, further, he candidly argues that the law should be carried one step beyond the Miranda requirements.

■■■ It is undisputed that at the time of arrest Agent Dowling did not inform Hall of the punishment he might receive if he were convicted of the robbery with which he was charged. Hall argues that without this knowledge he simply was not in a position to make the knowing and voluntary waiver contemplated by Miranda. Miranda, however, reflects the Supreme Court's concern that an accused might, to his detriment, forfeit rights afforded him by the Constitution simply because he was not aware that he possessed such rights. We do not find in that decision any intimation that knowledge of the punishment for the crime with which he was charged is a prerequisite to a valid waiver of constitutional rights and we conclude that the validity of Hall's waiver is not vitiated by the admitted absence of knowledge or information as to the possible punishment. Furthermore, we are unable to agree with Hall's argument that he could not validly waive his right to remain silent and his right to the assistance of counsel without the advice of counsel with respect to the waiver itself. Unquestionably this argument goes beyond Miranda and Hall so admits. Miranda clearly contemplates that an accused may make a valid waiver of his rights without the presence or aid of counsel. This threshold decision is for the accused, and the police are not required to carry about with them a lawyer to inform him of those rights which Miranda so obviously envisions will be explained to him by law enforcement or judicial authorities. The waiver document signed by Hall explained in clear and simple terms that he would be provided an attorney "now" if he so desired. Clearly Dowling was prepared

to afford Hall the assistance of counsel with respect to his initial decision if Hall wished it. *Miranda* requires no more and we are not disposed to fashion such a requirement as here urged.

■ From the record it appears that Hall, in all respects, made a voluntary and understanding or intelligent waiver of his rights to remain silent and to the services of counsel. We so conclude, not simply because of the "boilerplate statement" he signed[6] but also because, on the facts and circumstances surrounding the arrest and waiver, we find nothing to compel a contrary result. Hall himself, as mentioned earlier, did not take the witness stand, even in the hearing in chambers, for the limited purpose of controverting the testimony of Agent Dowling, and we find nothing in the Agent's straightforward and credible testimony to cast doubt upon the correctness of the conclusion reached in the court below. As the Supreme Court suggested in *Miranda,* "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver." Miranda v. State of Arizona, supra, at 475, 86 S.Ct., at 1628.

■ Concerning his confession, Hall presents one further argument. In conference prior to the presentation of counsel's arguments to the jury and the giving of the court's charge, counsel for Hall requested the court to instruct the jury that, before they could consider Hall's confession, they must find that he had "voluntarily, knowingly, and intelligently" waived his right to remain silent. The judge indicated that he would refuse the request that he use the word "intelligently," that he would instruct that the waiver and statement must be found to have been "voluntarily and understandingly" made because he considered the

terms "understandingly" and "intelligently" to be substantially equivalent although "intelligently" is a less desirable term. Defense counsel was further instructed that his argument to the jury on this point should be phrased accordingly.[7] Hall contends that this ruling by the court was prejudicial error as "intelligently" is the precise term employed by the Supreme Court in *Miranda* and implies a different—and perhaps stricter—test than is connoted by "understandingly." We find no reversible error here. As the Tenth Circuit recently noted, *Miranda,* while concerned with voluntariness in terms of admissibility, "does not undertake to prescribe the prerequisites to a jury finding of factual voluntariness." Coyote v. United States, 380 F.2d 305, 310 (10 Cir. 1967). We are of the opinion that the court's charge adequately explained to the jury its duty in this regard, the duty to examine the circumstances surrounding the confession and determine whether Hall freely, voluntarily, and knowingly waived his right to remain silent; also that counsel's argument to the jury was fully as forceful and persuasive as the evidence with which he was confronted would permit. We note, further, as the Government urges, that the test is not whether Hall made an intelligent decision in the sense that it was wise or smart to admit his participation in the crime, but whether his decision was made with the full understanding that he need say nothing at all and that he might then consult with a lawyer if he so desired.

In his brief, Hall asserts several other claims of error, most of which relate to or tend to enlarge upon the contentions which have been specifically considered and discussed herein. We have examined them carefully and have found no error.

Affirmed.

---

6. See United States v. Hayes, 385 F.2d 375 (4 Cir. 1967).

7. Counsel followed the court's instructions on this point, and the word "intelligently" does not appear in his argument. However, perhaps through inadvertence, the court at one point in charging the jury stated: "Unless you find that the waiver, the giving up of the rights was freely, voluntarily, knowingly, *intelligently,* understandingly made, * * *." Thus, the basis for Hall's contention here is really narrowed to the sole fact that he himself was unable to argue that the waiver had not been "intelligently" made.