Commonwealth *v.* Hawkins, Appellant.

Argued January 11, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*James B. Crummett,* with him *Oscar N. Gaskins,* for appellant.

*Carolyn E. Temin,* Assistant District Attorney, with her *Milton M. Stein,* Assistant District Attorney, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, June 28, 1972:

Frank Hawkins was convicted by a jury of voluntary manslaughter.[1] From the judgment of sentence, this appeal was filed. We affirm.

The principal claim of error is the trial court's denial of a pretrial motion to suppress a statement given by Hawkins to the police and in permitting evidence of this statement to be used at trial. The record discloses the following pertinent facts.

About 10:15 p.m., on May 22, 1970, Moses Howell was shot in a North Philadelphia bar and died sixteen days later. Death was due to a wound caused by a bullet which entered the abdomen about four inches to the right of the navel and then pierced vital internal organs.

On June 24, 1970, the appellant, Hawkins, accompanied by his attorney, Oscar Gaskins, surrendered himself to the District Attorney's office. He was subsequently taken to the Police Administration Building at Eighth and Race Streets in Philadelphia, where he

---

[1] Not in issue here is appellant's other conviction, that of carrying a concealed deadly weapon for which he received a concurrent sentence.

was questioned by a city police detective, White, about the Moses Howell shooting without Gaskins being present. Hawkins orally admitted to White that he fired the shot which caused Howell's death, but said he had acted in self-defense. His admission and version of the occurrence were then recorded on a typewriter by White and the finalized statement was read and signed by Hawkins. The entire interrogation process lasted three and one-half hours.

Contending it was constitutionally impermissible for the police to question Hawkins in the absence of his known counsel, a pretrial motion to suppress Hawkins' statement was filed. After an evidentiary hearing, the motion was denied.

At the suppression hearing, Attorney Gaskins testified that upon being retained and informed by Hawkins that the police were looking for him, he surrendered him to a Detective Hahn of the District Attorney's office about 1 p.m., on June 24th; that Hahn told Gaskins Hawkins would be "transported" to the Homicide Division Headquarters of the City Police Department at Eighth and Race Streets for processing (fingerprinting, etc.) and "we will not ask him any questions";[2] that Gaskins then advised Hawkins he would be available if needed and left; that about 9:30 p.m., Gaskins received a phone call from a friend or relative of Hawkins saying the latter was being "interrogated" by the police; that he immediately phoned Detective White at police headquarters and informed him he represented Hawkins and his client was not to be questioned; that White said Hawkins had already given a statement and that White had made "attempts" to contact Gaskins by phone without success.

---

[2] Testifying at the suppression hearing, Detective Hahn categorically denied telling counsel that police would refrain from questioning appellant.

Detective White testified that Hawkins arrived at the City Police Administration Building in a police patrol vehicle about 2:50 p.m., on June 24th; that he was advised of his constitutional rights, as mandated by *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966), at 4 p.m., before any questioning occurred; that these warnings included Hawkins' right to have a lawyer present during any police questioning; that Hawkins said he understood and in answer to the question: "Do you want to either talk with a lawyer at this time or have a lawyer with you while we ask you questions?," Hawkins replied, "No"; that immediately thereafter Hawkins admitted shooting Moses Howell, but claimed he had acted in self-defense; that subsequently Hawkins repeated the statement which White recorded on a typewriter and when the statement was finalized about 7:05 p.m., it was read and signed by Hawkins. On cross-examination White admitted that "toward the beginning of the interview" Hawkins advised him that he was represented by Attorney Gaskins. He also stated that about 10 p.m. (after Hawkins' statement was completed, recorded and signed), Hawkins for the first time indicated he wanted to phone his attorney and that in response to this request, White placed a phone call for Attorney Gaskins at 10:03 p.m., and that White did not recall speaking with Attorney Gaskins at any other time that evening.

Hawkins did not testify at the suppression hearing so that White's testimony to the effect that Hawkins was warned of his right to have a lawyer present during the questioning and also that Hawkins said he did not desire a lawyer at that time remained undisputed when the suppression hearing judge ruled Hawkins' in-custody statement was admissible as trial evidence.[3]

---

[3] At trial, Attorney Gaskins did not testify but Hawkins did. He stated that before the police questioning began he asked to

That Hawkins knew of his right to remain silent and to have an attorney present at the time the challenged statement was given was not questioned at any time in the trial court and it is not questioned here. Additionally, it was conceded at trial that the statement involved was given voluntarily.[4] Hence, the question for decision narrows itself to a determination of whether a person accused of crime who has already engaged counsel may with full knowledge of his rights effectively waive his right to have counsel present while he is questioned by the police. We conclude he may.

Appellant's contention herein is in many ways similar to the argument advanced in *Coughlan v. United States*, 391 F. 2d 371 (9th Cir. 1968). There a confession was obtained from defendant at a time when he was represented by court-appointed counsel, a fact well known to the interrogating officers. No notice was given by these officers to defendant's counsel of the intended interviews and he was not present when the statement was taken. The court was asked to rule that any statement, admission, or confession secured by police from one represented by an attorney, where the attorney was not timely advised of the proposed interview or interrogation, be rejected as violative of the right to counsel. Appellant conceded that the Sixth Amendment right could be voluntarily waived *but contended that such a waiver would never be knowing and*

---

have Attorney Gaskins present and that Detective White left the room wherein they were located, but upon returning told him Attorney Gaskins was "on the way." Under the circumstances, this testimony would not effect the admissibility of the statement at trial. Cf. Penna. Rules of Criminal Procedure, 323(j).

[4] Aside from this concession by counsel, Hawkins personally testified that he *wanted* to tell Detective White his version of what happened, and that is why he gave the statement.

*truly voluntary unless counsel was present to advise
the client.*[5]

In rejecting this argument, the court observed at
page 372 that: "It well may be that the day is approach-
ing when the right to counsel may be expanded to the
point where an accused may only be interrogated by the
police in the presence of his lawyer. However, no per-
suasive precedent for the holding here sought has come
to our attention.", but went on to hold that a clear
and knowing waiver had been shown.[6] See also *State
v. Renfrew*, 280 Minn. 276, 159 N.W. 2d 111 (1968).
However, the following caveat was noted at page 372:
"We . . . do not want to be considered as lending our
approval to the practice, if indeed a practice exists, of
interviewing accused persons in jail in the absence of

---

[5] A somewhat analogous argument was advanced in *United
States v. Hall*, 396 F. 2d 841 (4th Cir. 1968) but the court re-
jected out of hand the idea that a defendant could not validly
waive his right to remain silent and his right to the assistance of
counsel without the advice of counsel with respect to the waiver
itself. The court said such an argument went beyond *Miranda*
and that the problem of exercising or waiving one's rights is a
"threshold decision . . . for the accused." 396 F. 2d at 845. See
also, *People v. Robles*, 27 N.Y. 2d 155, 263 N.E. 2d 304 (1970), cert.
denied 401 U.S. 945 (1971), where the Court of Appeals of New
York said that, "The assertion that once an attorney appears there
can be no effective waiver unless made 'in the presence of an at-
torney' is merely a theoretical statement of the rule. . . . The
settled principle is that not every conversation between police and
accused is unlawful. . . . . [R]epresentation by counsel should
not give a suspect a special privilege to speak unreservedly to the
police with unlimited exemption from responsibility for voluntary
statements."

[6] The opinion was per curiam and the court did not set out the
facts which established waiver except to say that the accused was
fully and fairly advised of and understood his constitutional rights,
including the right to have his appointed attorney present and
that with understanding he waived those rights and voluntarily gave
the incriminating statements to police.

counsel. The better, fairer and safer practice is to afford the defendant's attorney reasonable opportunity to be present. When this is done the heavy burden of proving a waiver of constitutionally protected rights is immeasureably eased."

The *Coughlan* holding was followed by the court in *United States v. Victor Four Star,* 428 F. 2d 1406 (9th Cir. 1970). There the defendant, charged with committing a burglary on an Indian reservation, was brought before a United States Commissioner, waived hearing and had counsel appointed to represent him. An FBI agent then accompanied defendant to the county jail, proceeded to question him about the burglary, and obtained an inculpatory statement. It was held that the circumstances of the case were sufficient to sustain the finding that defendant voluntarily waived his *Miranda* right to have counsel present at the interview.[7]

It is, of course, for the Commonwealth to prove that appellant was suitably warned, which was presently done and not controverted. Beyond that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S. Ct. 1602, 1628 (1966).

In reiterating the strong presumption against waiver and the high standards of proof needed to overcome this presumption, the Court in *Miranda* relied upon *Johnson v. Zerbst,* 304 U.S. 458, 58 S. Ct. 1019 (1938),

---

[7] The FBI agent testified, and the trial court accepted his testimony, that before initiating any questioning he read a form containing each *Miranda* right and warning, explained each warning in detail, had defendant read the form back to him, and had defendant read and sign a section of the form which stated in essence that he knowingly and understandingly waived these rights.

in which the Court unequivocally stated: "The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused." 304 U.S. at 464, 58 S. Ct. at 1023. Similarly, in a post-*Miranda* decision, the Fifth Circuit observed: ". . . the cases in which it is clear that the warnings have been given must be considered on their own facts in order to determine the question of waiver. The courts must do this on an *ad hoc* basis, since no *per se* rule has thus far been adopted dealing with this problem." *Narro v. United States,* 370 F. 2d 329, 330 (5th Cir. 1966).

Instantly, appellant was twenty-eight years of age at the time of his arrest and was in apparently good health. He had reached the tenth grade in school and had an I.Q. in the dull-normal range. He had also had contact with the police on several prior occasions. The instruction of the Supreme Court in the *Miranda* decision was that "the accused must be adequately and effectively appraised of his rights . . . ." 384 U.S. at 467, 86 S. Ct. at 1624. "[A] warning is not *effective* if it is not understood." *Frazier v. United States,* 419 F. 2d 1161, 1168 n. 31 (1969). At no stage in the suppression proceeding was it ever asserted that appellant did not understand the warnings given to him. There was no prolonged, continuous questioning of the type found objectionable in *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A. 2d 426 (1968). In fact there is no indication that appellant was questioned more than momentarily before he made the oral statement which was later incorporated into a recorded statement.

It is also contended that it was reversible error for the lower court to admit into evidence statements of

the deceased naming appellant as the one who had shot him.

The following illustrates the factual background of this argument: Immediately after the shooting Howell was taken to St. Luke's Hospital by two patrons of the Cinderella Bar, Charles Salley and Herman Lesane. Salley then brought the parents and wife of the decedent to the hospital. The father testified that as his son lay mortally wounded on a stretcher in the emergency room, the latter said "Daddy, Oh . . . I got shot." Asked by whom, the son replied, "Frank Hawkins." The decedent's mother was allowed to testify that her son had said to her, "Momma, take care of my kids, because I'm not going to make it, momma," adding, "Momma, why did Frank shot [sic] me? I wouldn't have done it to him." Mrs. Wanda Howell, wife of the decedent, testified that when she saw her husband in the intensive care unit of the hospital, he told her that "Frank Hawk shot him."

Additionally, two members of the Philadelphia Police Department [Officer Wholey and Detective Dressner] talked with Howell approximately one hour after the shooting.[8] Howell said that he had had an argument with appellant and that Hawkins had shot him once in the stomach.

On the afternoon of June 6th, Detective Dressner again spoke briefly with Howell. He began the interview by asking decedent how he felt and was told, "Bad, I ain't going to make it, man." The officer again asked for details of the incident and was told, "Frank Hawkins shot me in the stomach." Howell was then shown two pictures and asked to pick out the man who

---

[8] At this time the victim had been removed from the emergency room and placed in the intensive care unit. He was receiving blood intravenously in one arm and a dextrous solution in the other and had a gastric lavage tube in his nostrils.

shot him. He selected the picture of Frank Hawkins. A nurse then requested that the interview be terminated. In the late hours of June 7th-8th, Moses Howell died of his wounds.

The Commonwealth argues now, as it argued below, that all of the above statements were properly admissible. The grounds asserted for the statements made within an hour of the shooting were either as dying declarations or res gestae and the June 6th statement to Detective Dressner as a dying declaration.

Counsel for appellant contends that those statements made by Howell to his relatives and to the police on the evening of the shooting cannot be admitted as res gestae because they lack the necessary spontaneity. Conversely, it is asserted that none of these statements can qualify as a dying declaration purportedly because the circumstances indicate that the decedent was not under a firm belief and moral conviction that death was impending.

Our reading of the record is convincing that all of the objected-to statements were admissible as dying declarations, rendering unnecessary any determination of whether the May 22nd statements were also res gestae.

Dying declarations of the deceased concerning the circumstances of his injuries are admissible in the trial of a person accused of killing him. To validate a dying declaration it is not necessary that the wounded man expressly say that he knows that he is dying; it suffices if at the time the declaration is made, the declarant believed he was in fact dying and that death was imminent, and death did actually ensue. *Commonwealth v. Knable,* 369 Pa. 171, 175, 85 A. 2d 114 (1952). See also, *Commonwealth v. Edwards,* 431 Pa. 44, 244 A. 2d 683 (1968). Hence, the admissibility of such a declaration depends primarily upon the state of the

declarant's mind. *Commonwealth v. Lockett*, 291 Pa. 319, 323, 139 A. 836 (1927). In passing upon the admissibility of an alleged dying declaration all the attendant circumstances should be considered, including the weapons which wounded him, the nature and extent of his injuries, his physical condition, his conduct, and what was said to and by him. *Commonwealth v. Plubell*, 367 Pa. 452, 80 A. 2d 825 (1951); 5 Wigmore, Evidence §1442 (3d ed. 1940).

It is uncontradictable that Howell was grievously wounded as he lay in the emergency room.[9] He had at that point lost a sizable quantity of blood and was continuing to bleed. In the same approximate time frame he told his father and mother who had shot him and asked his mother to look after his children because he would not "make it."[10] Equally extreme conditions obtained when Howell was first questioned by police officers. Little more than an hour had elapsed since the shooting. Tubes had been hooked up to his body and he was in evident danger. The requisite sense of impending death is an eminently reasonable inference from these facts.[11]

---

[9] Howell had been struck by a .38 bullet which entered his body four inches to the right of the navel, tearing the liver, passing through the gall bladder, tearing loops of the bowel, exiting to the right of the spinal column, having travelled generally on a horizontal plane.

[10] Appellant makes much of the fact that deceased told his mother to get $115 which he had entrusted to Charles Salley [the money was apparently given to Salley during the trip to the hospital]. Concern with such mundane matters, it is argued, is inconsistent with a frame of mind focused on impending death. We think the act to be equivocal at best. If Howell thought he was going to die, his action could have been some sort of crude testamentary act. Notwithstanding such an interpretation, this isolated incident seems to be overwhelmed by all of the other evidence showing belief in impending death.

[11] Since declarant believed he was about to die, his statements are competent and admissible, even though he lingered for sixteen

The statement made to Detective Dressner on June 6th also meets the requisites of a dying declaration. Howell had twice undergone surgery and was at this point lapsing in and out of consciousness. His response to an initial question about how he felt makes it manifest that he thought he was about to die.

This Court has held with regard to the res gestae exception that the fact that statements are given in response to questions does not preclude them from being spontaneous. *Commonwealth v. Edwards,* supra. Nor should it affect their status as dying declarations.

Appellant next complains the trial court erred in refusing to grant a motion for a mistrial after an outburst on the part of decedent's brother who was a spectator at the trial.

Midway through defense counsel's closing argument, a brother of the decedent stood up in the courtroom and shouted at Attorney Gaskins, "He murdered him. You are a bum." The trial judge immediately had this spectator placed in the hands of the court crier,[12] and addressed the jury as follows: "Ladies and gentlemen of the jury, it is most unfortunate that we had this outburst. I direct you to take it out of your mind. The person who got up in the courtroom did not testify, and you are to remove it from your minds and not in any way let it affect your deliberation. *I will instruct you fully in my charge tomorrow morning,* and I am confident that you will not let it affect your deliberations, either for or against the defendant."

Appellant extracts from the italicized portion of these remarks an indication by the judge that he would

days thereafter. See *Commonwealth v. Lockett,* 291 Pa. 319, 139 A. 836 (1927).

[12] The action taken by the trial judge finds approval in the American Bar Association Project on Standards Relating to the Judge's Role in Dealing with Trial Disruptions, Page 17, E. 1 (Tentative Draft 1971).

more fully deal with this outburst in his jury charge. The incident was never mentioned again by the court. A more reasonable interpretation, in our view, is that the judge was simply telling the jury to forget what had just occurred and reach their own conclusion after they heard his charge on the pertinent law.

Appellant argues that even if further instructions had been given, the outburst was so inherently prejudicial that its effect could never be eradicated from the collective mind of the jury. Again, we disagree and might hasten to add that, strangely enough, the incident might have redounded to appellant's benefit.

In his attempt to exonerate himself on the ground of self-defense, appellant introduced a substantial amount of evidence on Moses Howell's exceedingly bad disposition, proclivity for violence and his prior difficulties with him. Some of this testimony also implicated Howell's three brothers.[13] The display of the younger brother's anger only served to illustrate some of the things said about the brothers in general.

A motion for a mistrial is within the sound discretion of the trial judge. See *Commonwealth v. Faison*, 437 Pa. 432, 264 A. 2d 394 (1970). Here the trial judge moved expeditiously to correct any adverse influence generated by these statements. Hence, we find no abuse of discretion in denying the mistrial motion.

---

[13] Appellant testified, inter alia, that he always knew Moses Howell to carry a hand gun.

Also related at trial was an incident which was alleged to have occurred in December of 1968, when the four Howell brothers brandishing pistols entered the Cinderella Bar and beat up appellant's girl friend, Dorothy Harrison. On this occasion Moses Howell was alleged to have pointed a gun at Frank Hawkins' head to discourage the latter's involvement.

Aris Haliday, the manager of the Cinderella Bar, testified that shortly after the shooting occurred Michael Howell, the spectator who had shouted out during summation, entered that cafe waving a pistol and demanded to know the whereabouts of appellant.

Finally, appellant asserts the charge was highly detrimental to him because the judge placed repeated emphasis on the duty to retreat before resorting to deadly force in self-defense while ignoring such factors as the difficulty of such escape when the other party is using a firearm and also the appellant's attempt to avoid this altercation.

In the case of *Commonwealth v. Butler,* 405 Pa. 36, 173 A. 2d 468 (1961), it was said at page 52 that, "It is elementary that the instructions to a jury must be read as a whole and the correctness and adequacy thereof determined from that reading." In the instant case, the trial judge took great pains to set forth the elements of the crimes charged and the defense thereto, repeating himself at times so that the jury might fully understand the factors to be weighed. The judge's efforts were not completely successful since after five hours of deliberation, the jury asked to be clarified on what constituted an avenue of escape. The judge recharged on that element of the law of self-defense without exception by counsel for appellant.

Our appraisal of the charge as a whole is that it was complete, correct and fair, and further that it affords appellant no basis for complaint.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE NIX:

I respectfully dissent.

Under the facts of this case, where the police were aware that counsel was retained, that counsel had expressed a desire to be present in the event of interrogation, that no significant delay would have been occasioned by awaiting his presence, and in the absence of any demonstrated prejudice to the Commonwealth, a waiver obtained in counsel's absence as a matter of law, should have been held invalid.

Former Chief Justice WARREN at the outset of his opinion for the majority of the Court in *Miranda v. Arizona,* 384 U.S. 436 (1966), stressed the fact that the issues then raised before the Court presented "questions which go to the roots of our concepts of American criminal jurisprudence: the restraints society must observe consistent with the Federal Constitution in prosecuting individuals for crime." 384 U.S. at 439. In formulating the procedural safeguards giving meaning to the right against self-incrimination and the right of counsel the Court cautioned that we must be constantly alert to prevent these rights from becoming a form of words in the hands of law enforcement officials. The clear purpose of *Miranda* was to insure that any incriminatory statement was the product of the free will and the judgment of the suspect after he had been made completely aware of his rights. It was an awareness of the pressures of custodial interrogation and that this type of questioning exacted "a heavy toll on individual liberty and trades upon the weakness of individuals. 384 U.S. at 455. "Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." 384 U.S. at 458.

The full significance of this mandate is appreciated where the subject, as in the instant case, is a young adult possessing dull-normal intelligence.[1] It is admitted that warnings were given the suspect in the in-

---

[1] The record contains a psychiatric evaluation of the appellant by Dr. von Schlicten which emphasized that the social judgment under stress was significantly impaired in that appellant appeared prone to impulsive and egocentric behavior. When placed in a relatively unstructured environment his judgment became more disorganized and ineffective the longer he attempted to work through a problem. He appeared to be functioning in a dull-normal level of intelligence.

stant case but under the circumstances it is my belief that they amounted to no more than a ritualistic recitation without meaning or substance. I agree that *Miranda* does not expressly direct the presence of engaged counsel at the time a waiver is given. I do not, however, concur in the reasoning of the majority, and the cases upon which they rely, that the mere fact that there was no such expressed direction necessarily justifies a rejection of the contention.[2] A prophylactic rule requiring the attorney's presence at least during the time the waiver is being extracted, I believe, is more consistent with the spirit of the *Miranda* decision and is the most effective method of achieving the objectives set forth therein. Courts in this stage of the development of our society must be cognizant that we have many individuals who, because of limitations of God-given endowments, are barely capable of dealing with the routine stresses of the world about us. Where, as here, we are concerned with a situation providing unique stresses, taxing even the most gifted in our community, special precaution must be taken to prevent overreaching by police officials.

In the case before us no interest of society would have been prejudiced if the questioning of the defendant had been deferred until the presence of counsel. If, in fact, there was a voluntary and considered judgment by the suspect to unburden his soul by discussing the incident with police officials there is no reason to believe consultation with counsel would stifle that desire. On the other hand, counsel's presence would restrain

---

[2] *Miranda* does require that questioning must cease when the suspect expresses his desire for counsel. Questioning cannot be resumed without counsel unless the resumption is initiated by the suspect. 384 U.S. at 444-45. It is certainly not a major departure to suggest that the obtaining of counsel is in fact an expression by the defendant that he wishes his presence during the critical stages of the proceedings.

the suspect who was motivated by fear, intimidation, ignorance, or unreasoned impulse, which is the objective *Miranda* has mandated us to seek. The very presence of counsel during custodial interrogation is a bulwark against the compulsion of the surroundings and provides a credible witness for the defense if there is a subsequent issue as to the circumstances surrounding the questioning.

The majority seems content to rely upon a stringent test in the determination of an intelligent and effective waiver to discharge their responsibility to protect the suspect's constitutional rights. Undoubtedly, such a test assists in the protection of a suspect's rights, but the prophylactic rule suggested is far more practical and effective protection. One does not need to be reminded that the protection afforded by the majority rule may be hollow indeed if the suspect must rely solely on his testimony to contravert the Commonwealth's evidence of waiver regardless of the burden of proof imposed.

The reluctance of the majority to reach this conclusion is most difficult to comprehend in view of the time honored prohibition that an attorney may not confer with an opposing party who is represented by counsel.[3] Surely it is not considered that an attorney's integrity is more suspect or his motives more sinister than that of police officials. No time in the prosecution of a criminal complaint is more critical than during custodial interrogation. In many instances, answers given in response to questions render subsequent assistance by counsel impotent.

I am unimpressed with the majority's observations that the suspect's unsolicited remarks after he has retained counsel should not be privileged. Here we are not concerned with unsolicited admissions but rather

---

[3] ABA Canons of Professional Ethics No. DR 7-104(A)(1).

inculpatory statements as a result of interrogation. Equally inapplicable is the argument that the suspect has the right to waive the presence of counsel during interrogation. The rule I suggest does not destroy this right, the suspect after consultation may still elect to dismiss his counsel and proceed with the interrogation in his absence. It does however, insure that he is fully appraised of the possible consequences of this course of action before the decision.

For these reasons I believe the extrajudicial statement of the appellant should have been suppressed and I would reverse the judgment of sentence and grant a new trial.

Mr. Justice ROBERTS and Mr. Justice MANDERINO join in this dissent.