412 A.2d 846

**COMMONWEALTH of Pennsylvania**

v.

**Robert RIGLER, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 25, 1980.

Decided March 20, 1980.

444

Andrew G. Gay, Albert L. Deutsch, Philadelphia, for appellant.

Robert B. Lawler, Chief, Appeals Division, Marianne E. Cox, Asst. Dist. Atty., Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN and FLAHERTY, JJ.

## OPINION

LARSEN, Justice.

The macabre events of this case give stark witness to the depths of depravity to which the criminal mind is capable of sinking; these events are as follows.

On May 10, 1975, Robert Rigler, appellant, and Charles Stickle, a co-defendant, lured two young girls, Beverly Rodenbaugh, (age sixteen) and Tina Statuti (age fifteen) to the French Creek Inn in Montgomery County. Rigler and Stickle had taken it upon themselves to investigate a recent beating of Rigler's father by unknown assailants and apparently thought the girls knew something about that incident.

Inside the Inn, appellant and Stickle severely beat and raped Beverly and Tina. Their sadistic appetites unsatiated, they transported the girls to a trailer lot of the Container Corporation in the Manayunk section of Philadelphia, and took them inside a parked trailer. Beverly and Tina were then choked, doused with gasoline, set on fire and left in the trailer as it erupted in flame.

Tina Statuti died in the blaze. Beverly Rodenbaugh was somehow able to crawl from the inferno, whereupon she became trapped under an adjacent trailer. Extricating her, fire department paramedics took her to the emergency ward of Roxborough Hospital. Although in critical condition, large parts of her body having been burned beyond recogni-

tion, Beverly remained conscious and coherent. She was able to identify appellant and Stickle as the perpetrators of the heinous crimes,[1] and she related the details of the incident to several witnesses. Approximately one month later, Beverly Rodenbaugh died as a result of her burns.

Appellant was convicted by a jury of two counts of murder of the second degree, two counts of rape and kidnapping, arson and conspiracy. Judgments of sentence were imposed—consecutive life sentences for the murder convictions; five to ten years, to run consecutively, for the conspiracy; and ten to twenty years, to run consecutively, for the remaining convictions. This direct appeal followed.

Appellant first argues that the suppression court erred in failing to suppress certain statements he made to the police on the day of his arrest. Although there is no single litmus-paper test for determining the validity of a confession, the parameters of appellate review of a suppression court's ruling of admissibility are well-defined.

The suppression court, which hears and evaluates the testimony, is required to make findings of fact and conclusions of law. . . . The court must determine whether the Commonwealth has established by a preponderance of the evidence that the confession was voluntary and that the waiver of constitutional rights was knowing and intelligent. . . . Our responsibility on review is "to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings." . . . In making this determination, this Court will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.

*Commonwealth v. Kichline*, 468 Pa. 265, 279, 361 A.2d 282, 290 (1976) (cites omitted). We will consider all of the

---

1. Beverly identified appellant as "Bob Jacquot, Frenchy's son." "Frenchy" is appellant's father, Robert Jacquot. Shortly thereafter, she identified a photograph of appellant as the man she referred to as "Bob Jacquot, Frenchy's son."

attendant circumstances to determine if it was sufficiently demonstrated that appellant's decision to speak was the product of a free and unconstrained choice and that the waiver of his constitutional rights was a knowing, intelligent and voluntary choice. *Id.*

The following facts and circumstances surrounding the statements were found by the suppression court and are amply supported by the record. Appellant was arrested at 8:10 a. m. on May 10, 1975 and arrived at the Police Administration building at 8:45 a. m. At 9:05 a. m., appellant was advised of his *Miranda* rights and waived his right to remain silent and his right to counsel. From 9:05 a. m.–9:30 a. m., Officer Michael Gannon interrogated appellant. During this interval, appellant gave a partially incriminating statement, admitting to being with the girls the prior evening and to having intercourse with them. At 9:30 a. m., appellant informed Officer Gannon that he would tell the whole truth after he talked to his girlfriend.

Appellant was then taken to the polygraph room where he stayed from 9:40 a. m. to 11:07 a. m., but no polygraph was administered. An attorney, Neil Carver, arrived at that time at the request of appellant's family to consult with appellant. From 11:07 a. m. to 11:25 a. m., appellant was allowed to use the restroom facilities, given water and then left alone in the interrogation room. At 11:25 a. m. until 12:15 p. m., attorney Carver consulted with appellant, and advised appellant not to make any further statements. Thereafter, attorney Carver informed Officer Gannon that he had explained to appellant his right to remain silent. According to attorney Carver's testimony, and that of Officer Gannon, attorney Carver did not tell the police not to further interrogate appellant, nor did he instruct them that he desired to be present during further interrogation of appellant.

From 12:15 p. m. until 12:30 p. m., appellant was left alone in the interrogation room, and he again was accorded restroom privileges and given water. At 12:30 p. m., Officer Gannon dialed the phone number of appellant's girlfriend,

with whom he lived, and appellant spoke with her until 12:35 p. m. Appellant was then left alone until 12:55 p. m. Appellant then banged on the door of the interrogation room and, when Officer Gannon responded, appellant said he wanted to tell him what happened. Appellant again waived his right to remain silent, and rendered a second statement to police. He also expressed a willingness to make this statement without the presence of an attorney.[2] This statement was much longer than the first. Appellant detailed the rapes, beatings and his participation in the burnings, as well as his subsequent incriminating conduct.

The suppression court further found that, at all times relevant to the giving of the statements, appellant was not under the influence of alcohol or drugs, was not tired, made no request that was refused, was fully able to understand his interrogators and to communicate without any difficulty. Attorney Carver also testified that he had thoroughly explained appellant's rights to him and that appellant understood them.

The suppression court concluded that appellant gave the statements freely and voluntarily, and that the waiver of his right to remain silent and his right to counsel was made knowingly, voluntarily and with full comprehension of his rights. These conclusions are adequately supported by the record.

Appellant would nevertheless have us find the waivers ineffective under the authority of *Commonwealth v. Hilliard*, 471 Pa. 318, 370 A.2d 322 (1977) and *Commonwealth v. Mercier*, 451 Pa. 211, 302 A.2d 337 (1973). The opinion of the Court in *Hilliard* held "[i]f counsel has expressed a desire to be present during interrogation, a waiver of counsel obtained in counsel's absence should be held invalid as a matter of law." *Id.*, 471 Pa. at 322, 370 A.2d at 324. Appellant's statements are not invalid under *Hilliard* as attorney Carver never expressed a desire to be present with

2. Appellant's brief admits that he waived his right to counsel and his right to remain silent. Brief for Appellant at 8.

appellant during further questioning. Rather, he simply informed police that he had advised appellant to remain silent—such advice cannot, without more, prohibit the subsequent questioning of appellant.[3]

■ Appellant also relies on *Commonwealth v. Mercier*, 451 Pa. 211, 302 A.2d 337 (1973) for the proposition that, once a suspect is questioned by police and asserts his right to remain silent, any reversal of that position must be initiated by him.[4] *Mercier* offers appellant no solace, however, as the record demonstrates without contradiction that 1) appellant *never* asserted his right to remain silent, nor did attorney Carver assert such right on his behalf and 2) appellant initiated the questioning which resulted in his second statement, as he previously said he would after he had discussed the matter with his girlfriend. For the foregoing reasons, we affirm the denial of the motion to suppress these statements.

Appellant's next contention is the lower court erred in refusing to grant his motion for a change of venue on the grounds of prejudicial pretrial publicity. Appellant's princi-

3. This is not to imply that this author agrees with the reasoning or holding of *Hilliard* which only expressed the views of three members of this Court. A majority of this Court has never subscribed to the above quoted proposition from *Hilliard*, which adopted the New York position enunciated in *People v. Hobson*, 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976). Part I of the opinion of the Court in *Hilliard*, per Mr. Justice Roberts, was joined only by Mr. Justice Nix and Mr. Justice Manderino and did not, therefore, express the opinion of a majority of this Court. Mr. Justice O'Brien concurred but joined only Part II of the opinion of Mr. Justice Roberts. We decline to hold now that the mere fact counsel has requested to be present with his client at interrogations prohibits the police from further interrogation in the absence of counsel, at the risk of invalidating as a matter of law any statements obtained at such counselless interrogations. That counsel had requested to be present during questioning is only one factor to consider among all attendant facts and circumstances pertaining to the giving of the statement, its voluntariness and the efficacy of the waiver of the defendant's rights. See *Commonwealth v. Hilliard*, 471 Pa. at 336, 370 A.2d at 331 (Eagen, J. (now Chief Justice), dissenting; joined by Jones, C. J. and Pomeroy, J.).

4. This argument, as well as the *Hilliard* argument, can necessarily only pertain to appellant's second statement.

pal objections in this regard concern certain articles which dealt with matters that were inadmissible at trial, these matters being co-defendant Stickle's conviction and this court's affirmance of the suppression of a third confession that appellant had made.

This Court has repeatedly held that the grant or denial of a change of venue is within the sound discretion of the trial court who is in the best position to assess the community atmosphere and judge the necessity for a venue change. *Commonwealth v. Richardson*, 476 Pa. 571, 383 A.2d 510 (1978). Absent an abuse of that discretion, the court's ruling on the motion will not be disturbed. *Id.* this Court has occasionally recognized in some cases that the publicity in the community was so pervasive and inflammatory that the bias of the jury can be *presumed*. *See, e. g. Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209, cert. denied, 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973). In such a situation, the normal requirement that defendant demonstrate *actual* juror prejudice is obviated.

Appellant introduced 66 articles at the change of venue hearing. Over half of these articles (36) were published more than one year prior to appellant's trial, another 13 were published at the time of co-defendant Stickle's trial, about 8 months prior to appellant's, and the remaining 17 anywhere from 8 months to 10 days prior to trial.

Considering the brutality and sensational aspects of the crimes, the press reporting was remarkably restrained. The earlier articles (those published more than one year prior to trial) were primarily of a factual nature, and, while the factual accounting was, given the nature of the crimes, a bit "rough," the reporting was not unduly emotional or inflammatory. Given the length of time between these articles and the trial, a sufficient period had elapsed for any possible prejudicial effects of the articles to fade from the minds of prospective jurors.

Those articles which were published within a year of appellant's trial merely gave accounts of the various court

proceedings of appellant, co-defendant Stickle (who was convicted) and appellant's father "Frenchy" Jacquot (who was acquitted). Those accounts of Stickle's and Jacquot's court proceedings were factual and unemotional, and did no more than recite events which were a matter of public record. The article concerning the suppressed confession was similarly factual, unemotional and a matter of public record. The contents of the confession were not revealed— only the fact of this Court's affirmance of the suppression. *Cf. Commonwealth v. Pierce, supra,* (articles reported contents of inadmissible confession which was intentionally leaked by law enforcement officials.)

Further, defense counsel conducted extensive and unrestricted *voir dire.* Of the 14 jurors selected (2 alternates included), 12 had either never heard of the case or had read the accounts approximately one year prior to the trial. And none of the jurors chosen had formulated a fixed opinion of appellant's guilt or innocence.[5] In short, an impartial jury was chosen.

■ Based on the foregoing, we agree with the lower court that there was no evidence of actual prejudice, nor was the pretrial publicity so "inherently prejudicial" as to justify a presumption of prejudice. Accordingly there was no error in denying appellant's motion for a change of venue.

■ Next, appellant contends that certain opinions given by two expert witnesses, Assistant Fire Marshal Lieutenant Quinn and Dr. Robert Segal, were based upon facts not in evidence and that the trial court erred, therefore, in not sustaining his objections to the stating of those opinions. According to appellant, Lieutenant Quinn testified the fire that killed Beverly Rodenbaugh was started by someone pouring gasoline inside a trailer and igniting it. The assertion that this opinion was not based upon facts of record is devoid of merit, as the record discloses Lt. Quinn directed

5. Only 11 of the 71 prospective jurors examined had any opinion of the case, and none of these were selected.

the investigation of the scene of the crime, personally examined the trailer and examined photographs of the scene. This was certainly sufficient information upon which to base his opinion.

As to Dr. Robert Segal, who testified on direct that the manner of the deaths was homicide, appellant again raises the objection this opinion was not based upon facts of record. Appellant asserts Dr. Segal testified on cross that certain information upon which his opinion was based was not a part of the record. This summary of this witness' testimony is inaccurate. Dr. Segal stated that he did not *personally* testify to all of the information upon which that testimony was based. However, prior testimony (especially that of Lt. Quinn), coupled with the information gleaned from Dr. Segal's autopsies, was sufficient information *of record* upon which to base the opinion regarding the manner of death.

Appellant next argues that the trial judge erred in allowing inflammatory testimony from several witnesses about Beverly Rodenbaugh's physical condition after her extrication from the trailer. These witnesses testified, *inter alia* that Beverly's body and face were blackened, charred and blistered, that her skin seemed to be melting off her feet, that most of her hair was burned off, and that one ear was partially missing.

At trial, prior to the introduction of each separate statement that had been rendered by Beverly, defense counsel challenged the admissibility of these statements under the dying declaration exception to the hearsay rule, specifically claiming that no foundation had been shown to establish that she sensed she was in imminent and present danger of death.[6] Under these circumstances, it was incumbent upon the Commonwealth to establish that Beverly's condition was such that she knew death was imminent. Her condition was, thus, of essential evidentiary value.

6. The dying declaration exception to the hearsay rule generally requires that the declarant must have been conscious of his or her impending death and that death actually ensue. *See generally* McCormick, *Evidence,* § 282 (West 2nd Ed.1972).

■ Nevertheless, appellant suggests the prejudicial impact of this testimony outweighed its probative value. We disagree. As we stated in affirming co-defendant Stickle's conviction, *all* of the prosecution's evidence is intended to "prejudice" the jury, and simply because it is damaging to the defense is no reason to exclude the evidence. *Commonwealth v. Smalls*, 460 Pa. 436, 333 A.2d 853 (1975). It was the atrocity of the crimes that rendered the testimony so damaging, and appellant cannot complain his crime was so offensive that the facts of the crime cannot be submitted to the jury because he would be prejudiced by such offensiveness.

Appellant next takes issue with a procedure employed by the trial court. During trial, Officer Winston testified Beverly Rodenbaugh had identified a photograph of appellant while in the emergency room of Roxborough Hospital. The trial judge, the Honorable Edwin S. Malmed, then handed a plain manila folder to Officer Winston which contained exhibit "C–32", a police photograph of appellant. Officer Winston, keeping the photograph out of sight of the jury in order to prevent them from discovering it was a police photograph, then identified "C–32" as the photograph shown to Miss Rodenbaugh.

Despite the laudable precautions taken by Judge Malmed to insure the jury would not know "C–32" was from police files, appellant now engages in wild speculation to conclude he was prejudiced by this procedure. His argument is that the "secretive manner" in which "C–32" was displayed during trial, the fact that police obtained the photograph within a short time after Miss Rodenbaugh named appellant as one of her assailants, and the fact that "there was no suggestion that the photograph came from a school yearbook or from the possession of acquaintances or any innocent source," could only lead the jury to conclude "C–32" had been obtained from police files. From Brief for Appellant at 22.

■ This argument engages in frivolous abstraction and obviously lacks merit. We know of no jurisdiction that requires the prosecution to establish where its photographic

exhibits *do not* come from. The trial judge took pains to prevent the jury from discovering the source of "C–32," and the jury could not have reasonably inferred such source was police files. *Cf. Commonwealth v. Allen*, 448 Pa. 177, 292 A.2d 373 (1972).

■ Finally, appellant asserts two instances of alleged prosecutorial misconduct. The first occurred when the defense counsel handed appellant an unloaded gun for identification. Although the assistant district attorney was aware the gun was unloaded, he stated for all to hear "don't leave that gun up there. Show it to him but don't leave it up there." Defense counsel moved for a mistrial on the grounds this statement was intended to paint appellant as a dangerous man. The trial court denied the motion for a mistrial, but admonished the prosecutor, and carefully instructed the jury to disregard his comment. While this Court does not condone the prosecutor's court-room theatrics, his remark was an isolated one occurring during the course of a fairly conducted month-long trial and certainly did not rise to the level of impropriety which would justify a mistrial. *See Commonwealth v. Stoltzfus*, 462 Pa. 43, 60–61, 337 A.2d 873, 881–82 (1975). As has been repeatedly stated, a defendant is entitled to a fair trial, not a perfect one. *See e. g., Commonwealth v. Spruill*, 480 Pa. 601, 391 A.2d 1048, 1051 (1978) (Larsen, J., dissenting); *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968).

■ Appellant's second allegation of prosecutorial misconduct concerns a comment made by the prosecutor during his summation to the jury. The prosecutor made reference to a doctor's reports and an x-ray that had not been placed in evidence. Appellant contends it was improper for the prosecutor to make such a reference to evidence not of record. When viewed in its proper context, however, appellant's objection evaporates—the prosecutor's reference to the reports and x-ray was a legitimate and fair response to comments made by defense counsel during summation. *See Commonwealth v. Stolzfus, supra*, 462 Pa. at 61, 337 A.2d at 882.

During trial, the Commonwealth called Dr. Herbert Copeland to rebut appellant's contention that he had been beaten into confessing. On cross, defense counsel requested the doctor's notes and x-rays. The prosecutor did not have them at that time, but stated they would be made available. Later that day, the doctor's reports and the x-rays were brought into the courtroom, but defense counsel never examined them.

The following day, in his closing remarks to the jury, defense counsel asked the jury to draw an adverse inference against the Commonwealth because the prosecutor had failed to read the doctor's reports into evidence. It was improper to ask for such an adverse inference as the Commonwealth had no reason to read Dr. Copeland's reports into the record, nor was the Commonwealth required to do so by any rule of law or evidence. Further, the reports were available to defense counsel and, had he chosen to do so, he could have examined them for inconsistencies and brought any inconsistencies out on cross examination. That counsel forewent the opportunity to examine the reports also militates against the adverse inference which counsel had asked the jury to draw.

In response to defense counsel's "adverse inference" remark, the prosecutor countered "[t]here is the x-ray. If you think for one moment that any piece of this report or this x-ray contradicts what Doctor Copeland told you yesterday, don't you think they would have brought it to your attention?" Given defense counsel's improper remark in his summation, the prosecutor's reference to the doctor's reports and x-ray was entirely appropriate, and did not constitute prosecutorial misconduct.

For the foregoing reasons, judgments of sentence affirmed.

ROBERTS, J., filed a dissenting opinion in which NIX, J., joined.

456

ROBERTS, Justice, dissenting.

I dissent. Careful review of the record convinces me that appellant's confession was obtained in violation of his right to counsel. Accordingly, the confession should not have been admitted at appellant's trial. I would vacate the judgment of sentence and remand for a new trial.

The record shows that appellant was arrested early in the morning of May 10, 1975 and taken to the police administration building. Appellant was initially advised of his right to remain silent as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and after making certain statements, refused to talk further. Later, after several hours in police custody, appellant consulted with an attorney retained by his family. The uncontradicted record discloses that the attorney advised appellant not to speak further to the police, and that the attorney advised the police that he had so instructed appellant. Nevertheless, some twenty minutes thereafter the police obtained appellant's confession, albeit after a recitation of the *Miranda* warnings, but, crucially, without notifying counsel. This was improper. Once an accused has retained counsel and once counsel has indicated to the police that he has advised his client to remain silent, the police should not be permitted to proceed to question the accused outside of counsel's presence. *Commonwealth v. Hilliard*, 471 Pa. 318, 370 A.2d 322 (1977); *Commonwealth v. Hawkins*, 448 Pa. 206, 220, 292 A.2d 302, 309 (1972) (Nix, J., joined by Roberts and Manderino, JJ., dissenting); see *Commonwealth v. Lark*, 482 Pa. 292, 294, 393 A.2d 1112, 1113 (1978) (Opinion in Support of Reversal Part I by Roberts, J., joined by Manderino, J.); id., 482 Pa. at 299, 393 A.2d at 1115 (Opinion in Support of Reversal by Nix, J., joined by Manderino, J.).

This view is consistent with the principles recently endorsed by a plurality of this Court in *Commonwealth v. Hilliard*, supra. In *Hilliard*, as here, police obtained a confession from an accused without the presence of counsel at a time when counsel had already been retained. Because of that circumstance, the confession was held inadmissible and

judgment of sentence was reversed. In holding the confession inadmissible *Hilliard* noted with approval the rule adopted by the New York Court of Appeals in *People v. Hobson*, 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976). That rule, simply put, is that "once counsel has undertaken to represent a defendant, the defendant cannot waive his right to counsel in custody unless counsel is present." *Hilliard*, supra, 471 Pa. at 322, 370 A.2d at 324. *Hilliard* quoted Chief Judge Breitel's observation in *Hobson* that:

> "The rule that once a lawyer has entered the proceedings in connection with the charges under investigation, a person in custody may validly waive the assistance of counsel only in the presence of a lawyer breathes life into the requirement that a waiver of a constitutional right must be competent, intelligent and voluntary. Indeed, it may be said that a right too easily waived is no right at all."

Id. at 484, 384 N.Y.S.2d at 422, 348 N.E.2d at 898 (1976) (citations omitted). I remain convinced that this rule is the appropriate one.

Of course, as a result of consultation with counsel an accused may decide to waive his right against self-incrimination. Nothing would prohibit that possibility. But I see no justification for allowing a counselled accused to waive this right in counsel's absence. The benefits of prohibiting such a practice have already been clearly explained by Mr. Justice NIX:

> "If, in fact, there [is] a voluntary and considered judgment by the suspect to unburden his soul by discussing the incident with police officials there is no reason to believe consultation with counsel would stifle that desire. On the other hand, counsel's presence would restrain the suspect who was motivated by fear, intimidation, ignorance, or unreasoned impulse, which is the objective *Miranda* has mandated us to seek. The very presence of counsel during custodial interrogation is a bulwark against the compulsion of the surroundings and provides a credible witness

for the defense if there is a subsequent issue as to the circumstances surrounding the questioning."

*Commonwealth v. Hawkins*, supra, 448 Pa. at 222–23, 292 A.2d at 310 (Nix, J., joined by Roberts and Manderino, JJ., dissenting).

There may also be circumstances where an accused, although represented by counsel, spontaneously volunteers statements to the police. And, as our prior cases have held, such statements should not be excluded. *Commonwealth v. Myers*, 481 Pa. 217, 392 A.2d 685 (1978). This case, however, clearly does not involve a spontaneous confession. Nor does the record demonstrate any other exigent circumstances which might excuse the failure to allow counsel to participate in the accused's decision to speak.

The majority would distinguish this case from *Hilliard* because counsel in this case did not specifically request to be present during any further interrogation. Certainly this confession could not stand if counsel had made such a request and the police had nevertheless failed to honor it. See *Commonwealth v. Lark*, supra. Still, counsel's failure specifically to request to be present during any later interrogation is no reason to afford the appellant's right to counsel's presence any less protection. And in this case counsel clearly expressed to the police his instructions to appellant that the latter not make any statement. Particularly in such a circumstance I would not permit the police then to obtain a statement from appellant outside of counsel's presence.

Finally, I must note that if *Hilliard* is as inapposite as the majority believes, it is indeed remarkable to what length the majority goes to discredit it. Majority Opinion, ante at n.3. If the question presented in *Hilliard* is not presented here I would not indulge in such inappropriate dicta.

There can be no doubt of the ugliness of the incidents that gave rise to this prosecution. But we must keep in mind the recent warning of Mr. Justice Stevens:

"Nothing that we write, no matter how forcefully expressed, can bring back the victim[s] of this tragedy . . .

The emotional aspects of the case make it difficult to decide dispassionately, but do not qualify our obligation to apply the law with an eye to the future as well as with concern for the result in the particular case before us." *Brewer v. Williams*, 430 U.S. 387, 415, 97 S.Ct. 1232, 1247, 51 L.Ed.2d 424 (1977) (concurring opinion). I would vacate the judgment of sentence and remand for a new trial.

NIX, J., joins this dissenting opinion.